[No. A025611. First Dist., Div. Four. Oct. 29, 1987.]

SUPERIOR MOTELS, INC., Plaintiff and Appellant, v.
RINN MOTOR HOTELS, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Parts II and III (only) are not published, as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

1036

---

**COUNSEL**

Glenn E. Miller and Johnston, Miller & Giannini for Plaintiff and Appellant.

Michael G. Zybala, Alex A. Harper, William J. Elfving, Mark L. Strombotne, Hoge, Fenton, Jones & Appel, Sobel & Volker and Ken Sobel for Defendants and Appellants.

---

**OPINION**

**POCHÉ, Acting P. J.**—The primary issues arising out of this complex action involving a commercial lease concern whether the appointment of a receiver for a lessee no longer in possession constitutes a material breach justifying termination of the lease and forfeiture of a sublessee's leasehold interests.

### BACKGROUND AND PROCEDURAL SEQUENCE

The genesis of this litigation concerns several parcels of real property situated in Sunnyvale, California. Plaintiff Superior Motels, Inc. (Superior) constructed a 100-unit hotel and an adjoining restaurant and cocktail lounge on one of the parcels in 1960. The other parcel remained unimproved. Superior thereafter operated the complex, which was commonly known as the Lamplighter Lodge.

In December of 1967, Superior sold the property and improvements to Lamplighter Properties, which immediately leased them back to Superior.[2] The term of the lease was 20 years, although Superior was granted the privilege to extend it for up to 20 additional years. Superior obligated itself

---

[2] It fairly appears that as part of the sale price Superior received promissory notes aggregating $588,000, which it then pledged to Lamplighter to secure Superior's performance of the lease. As a result of these transactions Superior became a limited partner in Lamplighter. Real Estate Equities, Inc. is Lamplighter's general partner.

to pay monthly rent of $10,000, plus 8 percent of the gross income generated by the hotel, restaurant, and bar if in excess of $400,000. Superior was prohibited from assigning the lease without Lamplighter's written consent.[3]

One of the lease's provisions read as follows: "Either (a) the appointment of a receiver to take possession of all or substantially all of the assets of lessee, or (b) a general assignment by lessee for the benefit of creditors, or (c) any action taken or suffered by lessee under any insolvency or bankruptcy act shall constitute a breach of this lease by lessee."

Superior continued operating the complex until 1969. On April 26th of that year, Superior executed an agreement whereby it assigned its interest in the lease to Royal Executive Inns of America, Inc. (REI), a Nevada corporation. Superior received 125,000 shares of REI capital stock and a cash sum to be determined according to a specified formula. The agreement included these provisions:

"7. In the event of any breach or default by REI of any terms or provisions to be performed by the Lessee under its lease with Lamplighter Properties, which it has assumed, Superior will promptly notify REI if and after it has received notice from Lamplighter Properties, and, thereafter, REI shall have fifteen (15) days to correct the deficiencies referred to in Lamplighter's notice. Should REI fail to do so, in addition to the remedies provided by law, Superior shall have the remedies provided in provision 8 following.

"8. In the event of notice by the Lessor to the Lessee of default or breach of the lease agreement, Superior shall have the same rights of enforcement upon breach or default after the expiration of fifteen (15) days notice as it would have if it were the Lessor, including without limitation the right to cure the default, and the right of re-entry, without Court proceedings at the expiration of sixty (60) days after notice of default."

---

[3] The assignment provisions of the lease read: "Lessee shall not assign this lease but may sub-let the said premises, or any part thereof, without the writtten consent of the lessor [Lamplighter] first had and obtained. Any sub-lease shall be upon the same terms and conditions contained herein, and the rent payable to the lessor shall be determined as set forth hereinabove, i.e. to the extent that the gross income which would have been received by the lessee, had the premises not been sub-leased, exceeds $400,000.00 per calendar year, the total annual rent payable to lessor shall be increased by eight (8%) per cent of said excess.

"This privilege of sub-letting extends only to the premises on which improvements currently exist, and lessee may not sub-let the unimproved property immediately adjacent to the Lamplighter Lodge without first obtaining the written consent of lessor.

"Any assignment or sub-letting of the adjacent land without such consent shall be void, and shall, at the option of the lessor, terminate this lease. This lease shall not, nor shall any interest therein, be assignable as to the interest of lessee, by operation of law, without the written consent of lessor."

Lamplighter consented in writing to this assignment, expressly noting that its consent was not intended to relieve Superior of its obligations as lessee required by the lease. REI then entered into possession and operated the complex (now renamed the Royal Executive Inn) without incident for several years.

REI was one of a number of business entities apparently controlled by REI's chairman, Walter Wencke. Between 1969 and 1974 there followed a bewildering procession of corporate acquisitions, name changes, and restructurings, the specifics of which need not be detailed here. During this period one of REI's reincarnations, The Rinn Corporation, sublet the motel and restaurant to a wholly owned subsidiary named Rinn Motor Hotels, Inc. (Rinn Motor), which in turn subleased the motel to Rinns Sunnyvale Motor Hotel (Rinns Sunnyvale), a joint venture comprised of Rinn Motor and Walter and Dorothy Pabst.[4] The two subleases and the joint venture agreement were all executed on October 1, 1972. In May of 1974, The Rinn Corporation was renamed Sun Fruit, Ltd. (Sun Fruit), which like, REI, was incorporated in Nevada.

Following execution of the subleases and the joint venture agreement, Mr. Pabst began managing the motel on behalf of Rinns Sunnyvale. The monthly rent payments required by the 1967 master lease between Lamplighter and Superior were forwarded from Rinns Sunnyvale to Rinn Motor and then to Lamplighter.

Unbeknownst to all, Wencke was systematically looting the companies under his control. When matters began to deteriorate, and after Sun Fruit's remaining directors (i.e., Wencke and Richard Mets) were at an impasse, Wencke applied to a Nevada state court and was appointed Sun Fruit's receiver.[5] The order to this effect was filed August 7, 1975.

When the president of Real Estate Equities, Inc., the general partner of Lamplighter (see fn. 2, *ante,* p. 1041), learned of this development he urged Superior's president to invoke the anti-receivership provision of the lease. In a letter dated August 22, 1975, Superior advised Sun Fruit that Lamplighter

---

[4] According to the terms of the joint venture agreement, the Pabsts agreed to contribute $50,000 in consideration for "20% of the entire joint venture interest."

[5] Wencke subsequently became the subject of extensive proceedings in the federal courts, one of which drily noted with the benefit of hindsight: "Because Nevada does not require a disinterested receiver, Wencke became the receiver." (*Securities & Exch. Com'n.* v. *Wencke* (9th Cir. 1978) 577 F.2d 619, 621.) The same court characterized the receivership as "simply a continuation of Wencke's fraud." (*Id.* at p. 622.) Wencke was eventually convicted of mail fraud and making false statements to the Securities and Exchange Commission. (*United States* v. *Wencke* (9th Cir. 1979) 604 F.2d 607.)

treated the appointment of a receiver as "a violation of the lease," as was the failure to submit an accounting. The letter concluded: "Accordingly, you are hereby notified in accord with Paragraph 8 of our Agreement of April 26, 1969, that if you have not cured these defaults completely within 15 days of this notice, then the undersigned will take over all rights it would have if it were the lessor, and will exercise its right of re-entry as therein provided." In a subsequent letter dated September 4th, Superior identified "an additional breach of the master lease," specifically "that a 20% interest in the lease has been assigned to others" (i.e., the Pabsts) contrary to the lease provision against assignments not approved in writing. (See fn. 3, *ante,* p. 1042.)

After 60 days had elapsed, Superior attempted to exercise its right of reentry but was rebuffed by Pabst and the president of Rinn Motor. The position of the joint venturers was that they had acquired possession by a sublease, which did not require written consent. Moreover, because "Lamplighter Properties has been accepting the rent for nearly three years," Rinns Sunnyvale perceived no "violation of any agreements."

Superior then served a three-day notice to quit possession on November 18th. Cited in the notice as reasons for this action were Sun Fruit's receivership and the fact that Sun Fruit "claims that it has sublet the above premises to Walter Pabst and/or Rinn Motor . . . . That is why this notice is directed to all such entities [sic]." Superior advised that it "hereby declares to elect [to treat] the lease under which you hold possession . . . as forfeited."

Receiving no satisfaction, Superior commenced this action by filing a "Complaint To Appoint Receiver, For Unlawful Detainer, To Regain Possession Of Leasehold And For Declaratory Relief" six days later. Named as defendants were Sun Fruit, Rinn Motor, Walter Pabst, and Rinns Sunnyvale. In addition to declaratory relief regarding the validity of the "transfers" of the lease, and the appointment of a receiver, Superior prayed for "a decree of specific performance of plaintiff's right of entry . . . and/or for restitution of said premises and that a writ of possession and any and all other applicable writs issue to aid plaintiff in regaining possession of said premises."

On February 9, 1976, Sun Fruit's default was entered by the clerk of the trial court. On October 1st of that year, the trial court conducted a brief hearing on Superior's request to enter a default judgment against Sun Fruit. Sun Fruit did not appear at the hearing, at the conclusion of which judgment was ordered entered as prayed. The judgment filed that same day

directed that Superior "shall have and recover possession of the above-described premises from defendant Sun Fruit, Ltd., its officers, agents and employees and all persons holding possession of the premises under or through it or them, and is entitled to a Writ of restitution of said premises from defendant Sun Fruit, Ltd., its officers, agents and employees and all persons holding possession of said premises under or through it or them." The judgment also embodied the trial court's determination that Sun Fruit's leasehold was "hereby declared forfeited."

On December 2-3, 1976, a nonjury trial was conducted on Superior's complaint against Rinn Motor, Rinns Sunnyvale, and Pabst, the remaining defendants (who will be hereafter collectively referred to as such). The trial court received evidence in the form of exhibits and testimony from Wencke, Pabst, and the respective presidents of Superior and Real Estate Equities, Inc. Defendants' general position, as stated in extensive trial briefs, was that forfeiture of their leasehold interests would be inequitable in light of the fact that the only breach of the lease had been committed by Sun Fruit, and that determining their right to possession was not foreclosed by the default judgment against Sun Fruit.

On March 1, 1977, the trial court filed its memorandum of decision announcing the intention to award judgment for Superior. The court and parties were in the course of preparing findings of fact and conclusions of law when they became aware that on March 3d the United States District Court for the Southern District of California had appointed an equity receiver to administer the affairs of Wencke's corporate empire. Sun Fruit, Rinn Motor, and Rinns Sunnyvale were among the entities entrusted to the receiver's stewardship.[6] The district court's order included a stay of "any proceeding against the entities in receivership" for the duration of the receivership "[e]xcept by leave of this Court."

In April and May of that year the district court made separate orders confirming that the stay applied to Superior's action in state court, and denying Superior's application for relief from the stay. On May 24, 1977, Wencke's authority to act as receiver was terminated by the Nevada court which had appointed him.

In December of that year, the district court made an order denying another application by Superior for relief from the stay and leave to proceed against "the entities in receivership." On Superior's appeal from this order, the Ninth Circuit concluded that the district court did not abuse its

---

[6] The receiver had in fact been acting in a temporary capacity since January 20, 1977.

discretion either by issuing the blanket stay or in denying Superior's application for exemption, but remanded the matter to the district court for it to consider whether the stay should be modified due to the passage of time. (*Securities & Exch. Com'n.* v. *Wencke* (9th Cir. 1980) 622 F.2d 1363.)

Once the matter was returned to the district court, a federal magistrate acting as a special master conducted an extensive evidentiary hearing on Superior's renewed application for relief from the stay. In October of 1982 the special master filed "Findings Of Fact And Conclusions Of Law And Recommendation" which were adopted by the district court the following month. Superior was thereby granted leave to continue its efforts to obtain possession of the property at the same time that the receiver was moving to have the default judgment against Sun Fruit set aside.[7]

The following events occurred in 1983 when proceedings were resumed in the trial court:

On January 14th, the trial court filed its findings of fact and conclusions of law in which it found that neither Rinn Motor nor Rinns Sunnyvale had "any right or claim to possession of any portion of the premises other than under and through Sun Fruit." Although the court's characterization of Rinns Sunnyvale as a "sub-sublessee" constituted an implicit rejection of Superior's argument that Rinns Sunnyvale had obtained possession through an invalid assignment, it nevertheless found that the establishment of the Nevada receivership for Sun Fruit "constituted a material breach by Sun Fruit of its obligations assumed by it upon the transfer to it of Superior's leasehold interest, and entitled Superior to exercise, after the requisite notices on failure of termination of the receivership, its reserved right of re-entry as against Sun Fruit and all persons or entities claiming under or through Sun Fruit." On the basis of these and other findings, the court concluded that Superior was "entitled to immediate possession under its right of re-entry as of . . . the date of the filing of the complaint in the within action, to[ ]wit, November 24, 1975," an accounting, and "to recover from defendants and each of them the amount of the net profits which otherwise would have accrued to and belong to . . . Superior."

---

[7] In November 1977 the receiver was authorized to commence an action on behalf of Sun Fruit for the purpose of vacating the default judgment entered against Sun Fruit. The receiver filed a complaint seeking this relief later that month, but the receiver took no further steps (such as effecting service on Superior) in the belief that such was contrary to the district court's stay. In accordance with the special master's recommendation, the district court's order expressly authorized the receiver to "continue" this litigation. A "First Amended Complaint For Vacation Of Void Judgment And Injunctive Relief" was filed by the receiver on November 19, 1982.

Also on January 14th, the trial court entered an interlocutory judgment declaring Superior's right to possession, which "accrued no later than November 24, 1975." The court further determined that the Sun Fruit-Rinn Motor and the Rinn Motor-Rinns Sunnyvale subleases executed on October 1972 were "terminated and forfeited as of November 24, 1975." Finally, "defendants and each of them are hereby ordered and directed to render a full, true and correct accounting to . . . plaintiff of all rents, issues and profits accruing to . . . defendants and each of them from the operation of said premises from and after November 24, 1975 to date of delivery of possession to plaintiff, . . . jurisdiction being specifically retained to review and approve such accounting, and upon approval of the same, plaintiff is entitled to an order directing said defendants and each of them to pay over to plaintiff the net profits accruing from the operation of said business entities on said premises from and after November 24, 1975."[8]

In early April Superior noticed a "Motion for Review and Approval of Accounting." In their written oppositions defendants objected to the necessity and propriety of a hearing devoted to accounting issues. Defendants urged (among other things) that (1) Superior "has suffered no damage as a result of the alleged breach of the anti-receivership clause," as evidenced by the findings of the federal magistrate adopted by the district court, and (2) Superior was erroneously awarded net profits for the period between trial and the date on which actual possession was surrendered.

On June 24th the trial court conducted an evidentiary hearing on Superior's motion and defendants' objections. After receiving lengthy briefs from the parties with respect to the accounting issues, the trial court on November 3d entered its final judgment to the effect that Superior was entitled to recover "after tax net operating profits" from Rinn Motor and Rinns Sunnyvale in the amount of $886,666, together with prejudgment interest of $189,005. The corresponding amounts assessed against Pabst were $149,161 and $29,483. These sums covered the period from November 24, 1975, to June 1, 1983. The court further concluded that "Plaintiff shall recover from defendants . . . all after tax net operating profits received by each said defendant from the subject motel/restaurant premises from and after June 1, 1983, and continuing to the date on which possession of said premises is in fact delivered to plaintiff, together with interest thereon at the rate of 10

---

[8] Defendants then filed motions for new trial based on grounds similar to those made once a final judgment was eventually entered and which will be summarized at a later point in the text. After these motions were denied, defendants filed notices purporting to appeal from the interlocutory judgment. Due to the lack of an appealable final judgment (see *Lacey* v. *Bertone* (1949) 33 Cal.2d 649, 652-654 [203 P.2d 755]; *Rose* v. *Boydston* (1981) 122 Cal.App.3d 92, 96-97 [175 Cal.Rptr. 836]), those appeals were dismissed.

per cent per annum from the dates received by said defendants until said sums are paid to plaintiff."

In November and December, defendants filed separate motions for new trial and petitions for relief from the forfeiture ordered in the judgment. Covering a number of common and repetitive grounds, these motions and petitions presaged many of the contentions now raised on these appeals. The general themes were twofold.

First, defendants argued that the default judgment obtained by Superior against Sun Fruit was void. They reasoned that an adjudication of Sun Fruit's rights was a prerequisite which had to be adjudicated before their sublessee rights could be forfeited. No valid service having been effected on Sun Fruit, the Nevada receiver (i.e., Wencke) was an indispensable party whose absence was fatal to all subsequent proceedings.

Second, defendants attacked the forfeiture on the ground that Superior had suffered no damage by reason of the breach of the anti-receivership provision between Superior and Sun Fruit, as evidenced by findings by the federal magistrate and the district court to this effect. The breach, which defendants saw as rectified when the Nevada receivership was terminated in 1977, was thus "merely technical or trivial in nature" and "certainly was not the type of breach that would support a forfeiture."

After receiving written opposition by Superior, the trial court on December 15th conducted a hearing at which it heard argument from the parties concerning the motions and petitions. The following day the court denied the motions and petitions in an order which did not elucidate the basis for its rulings.

Timely notices of appeal were filed by Rinn Motor and Rinns Sunnyvale from the judgment and the order denying their respective petitions for relief from forfeiture. ■ ■ ■ ■ Pabst also appealed from the judgment.[9]

---

[9] Pabst labors under the profound misapprehension that he has also appealed from the order denying his petition for relief from forfeiture. He has not. The only notice of appeal from the trial court's order denying defendants' petitions was filed by Rinn Motor and Rinns Sunnyvale "by and through their Federal Equity Receiver, R. N. Gould." The notice, although it does recite that "defendant Walter Pabst also joins in this appeal," is signed by a member of the law firm acting as "Attorneys for R. N. Gould." Rule 1(a) of the California Rules of Court states with absolute clarity that a notice of appeal "shall be signed by the appellant or by his attorney." Pabst has at all times been represented by separate counsel, and there is nothing whatsoever in the record indicating that his codefendants' attorneys were authorized to file a notice of appeal on his behalf. The notice is therefore wholly ineffectual as the required means of commencing a valid appeal. (*Isom* v. *Slaughter* (1962) 200 Cal.App.2d 700, 705 [19 Cal.Rptr. 541]; *Edlund* v. *Los Altos Builders* (1951) 106 Cal.App.2d 350, 357 [235

Superior has also appealed from the judgment, "but only so far as it fails to award plaintiff pre-tax net operating profits received by defendants from the subject premises on and after November 4 [*sic*: 24], 1975."

REVIEW

I

Defendants are clearly aggrieved by the default judgment entered against Sun Fruit for it constitutes the foundation of the subsequent judgment entered against them. They did not, however, appeal from this judgment, which became final. In recognition of these facts, they have mounted a collateral attack upon the default judgment. According to defendants, because service was made upon Sun Fruit's president Richard Mets and not upon Wencke in his capacity as the receiver appointed by the Nevada court, that service was defective according to Nevada law and the default judgment is consequently void.

Defendants are entitled to press this challenge, based as it is upon a perceived jurisdictional infirmity making the judgment void on its face. (8 Witkin, *op. cit. supra*, Attack on Judgment in Trial Court, §§ 6 [pp. 410-411], 12-13 [pp. 414-417].) They do not, however, appreciate the very stringent rules governing such a claim.

"The validity of the judgment on its face may be determined only by a consideration of the matters constituting part of the judgment roll." (*Johnson v. Hayes Cal Builder, Inc.* (1963) 60 Cal.2d 572, 576 [35 Cal.Rptr. 618, 387 P.2d 394].) "The record is the judgment roll, and upon collateral attack it is the only evidence that can be considered in determining the question of jurisdiction." (*Estate of Wise* (1949) 34 Cal.2d 376, 382 [210 P.2d 497]; see *Brockway* v. *Heilman* (1967) 250 Cal.App.2d 807, 810 [58 Cal.Rptr. 772].) The judgment roll for a default judgment is statutorily defined as "the summons, with the affidavit or proof of service; the complaint; the request for entry of default with a memorandum indorsed thereon that the default of the defendant in not answering was entered, and a copy of the judgment . . . ." (Code Civ. Proc., § 670, subd. (a).)

Defendants' contention founders because it is not based upon the judgment roll as so defined. They rely instead on Wencke's order of

P.2d 28]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 377, pp. 380-381.) This purported appeal must therefore be dismissed (*Edlund* v. *Los Altos Builders, supra*) and the arguments in Pabst's briefs challenging the denial of his petition for relief from the forfeiture will be disregarded accordingly.

appointment, Nevada statutes governing the powers of a corporate receiver, and Wencke's testimony at trial. This is evidence extrinsic to the judgment roll and thus "is wholly inadmissible, even though it might show that jurisdiction did not in fact exist . . . ." (*Hogan* v. *Superior Court* (1925) 74 Cal.App. 704, 708 [241 P. 584].) It is therefore "unavailing for any purpose" (*Willey* v. *The Benedict Co.* (1904) 145 Cal. 601, 605 [79 P. 270]) and cannot be considered here. (*Sievers* v. *Pacific Gas & Elec. Co.* (1943) 57 Cal.App.2d 455, 456 [134 P.2d 850].) The upshot is that defendants have presented no competent evidence to rebut the presumption that the trial court "acted in the lawful exercise of its jurisdiction." (Evid. Code, § 666; see *Johnson* v. *Hayes Cal Builders, Inc., supra,* 60 Cal.2d 572 at p. 578; *Craney* v. *Low* (1956) 46 Cal.2d 757, 760 [298 P.2d 860]; *Borenstein* v. *Borenstein* (1942) 20 Cal.2d 379, 381 [125 P.2d 465]; *Willey* v. *The Benedict Co., supra,* at pp. 603-605; *People* v. *Davis* (1904) 143 Cal. 673, 677-678 [77 P. 651]; *Brockway* v. *Heilman, supra,* 250 Cal.App.2d 807 at p. 810.) Their collateral attack fails accordingly.

### II, III[10]

. . . . . . . . . . . . . . . . . . . . . . .

### IV

At the time Superior advised defendants that it was electing to terminate the latter's possessory rights, it cited as its reasons the failure to provide an accounting, the supposedly unauthorized assignment(s) from Sun Fruit, and the fact of Sun Fruit's receivership. The accounting matter was apparently resolved between the parties prior to trial. As previously mentioned, the trial court tacitly determined that defendants had obtained possession via permissible subleases, a determination not now challenged by any of the parties. ██ This left only the receivership, which the court found "constituted a material breach by Sun Fruit of its obligations assumed by it upon the transfer to it of Superior's leasehold interest, and entitled Superior to exercise . . . its reserved right of re-entry as against Sun Fruit and all persons or entities claiming under or through Sun Fruit." Defendants now attack this finding as factually and legally incorrect. (Portions of defendants' arguments implicating the forfeiture aspect of the finding will be addressed in the next section of this opinion.)

---

[10]See footnote 1, *ante,* page 1032.

## (A)

■ The law sensibly recognizes that although every instance of non-compliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated. (See 4 Corbin on Contracts (1951) § 943, pp. 806-807; Farnsworth, Contracts (1982) §§ 8.15-8.16, pp. 607-613; Murray on Contracts (2d rev. ed. 1974) § 167, pp. 322-327; 11 Williston on Contracts (3d ed. 1968) § 1292, pp. 8-9.) Following the lead of the Restatements of Contracts, California courts allow termination only if the breach can be classified as "material," "substantial," or "total." (See *Coughlin* v. *Blair* (1953) 41 Cal.2d 587, 598-599 [262 P.2d 305]; *Sackett* v. *Spindler* (1967) 248 Cal.App.2d 220, 229 [56 Cal.Rptr. 435]; *Story* v. *San Rafael Military Academy* (1960) 179 Cal.App.2d 416, 417 [3 Cal.Rptr. 847]; *Budget Way etc. Laundry* v. *Simon* (1957) 151 Cal.App.2d 476, 480-481 [311 P.2d 591]; *Asso. Lathing etc. Co.* v. *Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 50-51 [286 P.2d 825]; *Smith* v. *Empire Sanitary Dist.* (1954) 127 Cal.App.2d 63, 72-73 [273 P.2d 37].)

Cardozo had occasion to examine the distinction between material and inconsequential breaches in his landmark decision regarding substantial performance of a construction contract. "The courts never say that one who makes a contract fills the measure of his duty by less than full performance. They do say, however, that an omission, both trivial and innocent, will sometimes be atoned for by allowance of the resulting damage, and will not always be the breach of a condition to be followed by a forfeiture." (*Jacob & Young* v. *Kent* (1921) 230 N.Y. 239, 241 [129 N.E. 889, 23 A.L.R. 1429].) "Where the line is to be drawn between the important and the trivial cannot be settled by a formula. 'In the nature of the case precise boundaries are impossible' (2 Williston on Contracts, sec. 841). The same omission may take on one aspect or another according to its setting. Substitution of equiv-alents may not have the same significance in fields of art on the one side and in those of mere utility on the other. Nowhere will change be tolerated, however, if it is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the contract . . . . The question is one of degree, to be answered, if there is doubt, by the triers of the facts . . . . We must weigh the purpose to be served, the desire to be gratified, the excuse for deviation from the letter, the cruelty of enforced adherence. . . . [T]he law will be slow to impute the purpose, in the silence of the parties, where the significance of the default is grievously out of proportion to the oppression of the forfeiture." (*Id.* at pp. 243-244.)

California too accepts that "[w]hether a breach is so material as to consti-tute cause for the injured party to terminate a contract is ordinarily a

question for the trier of fact." (*Whitney Inv. Co.* v. *Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 601 [78 Cal.Rptr. 302]; accord *Porter* v. *Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410, 421 [57 Cal.Rptr 554]; *Asso. Lathing etc. Co.* v. *Louis C. Dunn, Inc., supra,* 135 Cal.App.2d 40 at p. 49; *Smith* v. *Empire Sanitary Dist., supra,* 127 Cal.App.2d 63 at p. 73; *Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 28 [142 P.2d 22].)

With these principles as our background, we turn to defendants' specific arguments.

### (B)

█ A lease provision against the bankruptcy, insolvency, or receivership of a lessee protects important interests of the lessor. The appointment of a receiver often entails drastic disruptive consequences to existing business relationships. (See *Hoover* v. *Galbraith* (1972) 7 Cal.3d 519, 528 [102 Cal.Rptr. 733, 498 P.2d 981]; *Golden State Glass Corp.* v. *Superior Ct.* (1939) 13 Cal.2d 384, 393 [90 P.2d 75]; *Barclays Bank of California* v. *Superior Court* (1977) 69 Cal.App.3d 593, 597 [137 Cal.Rptr. 743]; *Cohen* v. *Herbert* (1960) 186 Cal.App.2d 488, 495 [8 Cal.Rptr. 922].) That a lessee's ability to remain solvent and retain the capacity for unimpeded operation constitutes a relevant and legitimate concern of a lessor is too obvious to require belaboring. (See *Coast Bank* v. *Minderhout* (1964) 61 Cal.2d 311, 316-317 [38 Cal.Rptr. 505, 392 P.2d 265], overruled to the extent inconsistent in *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 953 [148 Cal.Rptr. 379, 582 P.2d 970]; *Central Trust Co.* v. *Chicago Auditorium* (1916) 240 U.S. 581, 589 [60 L.Ed. 811, 814-815, 36 S.Ct. 412].) Notwithstanding the lessor's primary concern with the uninterrupted payment of rent, such a provision ensures that the lessor is not forced into an involuntary relationship with a tenant not of his choosing. Even if rent continues to be paid, "[t]enant insolvency presents uncertainty and inconvenience which the lessor is understandably anxious to avoid." (Note, *The Enforceability of Lease Forfeiture-Upon-Bankruptcy Covenants: A Proposal for Damages as an Alternative Remedy* (1976) 49 So.Cal.L.Rev. 339, 360-361, text and fn. 81.) California accepts such provisions as valid and enforceable. (*Farnum* v. *Hefner* (1889) 79 Cal. 575, 580-581 [21 P. 955]; 4 Miller & Starr, Current Law of Cal. Real Estate (1977 rev.) § 27:100, p. 431.)

█ Defendants contend in effect that the sole purpose of the anti-receivership provision of the lease was to assure the payment of rent to Lamplighter, "not to confer a benefit on Superior." Superior responds that the objects of the provision, when read in conjunction with the 1969 assignment granting Superior a right of reentry, covered not only payment of rent

but also protection of the value of the REI shares it received in compensation for the assignment. The trial court admitted extrinsic evidence to determine the meaning of the provision, a ruling defendants do not now challenge, and rejected defendants' interpretation of the provision. Only if the contrary construction accepted by the trial court is unreasonable and unsupported by substantial evidence can defendants' contention be sustained. (See *Glendale City Employees' Assn., Inc.* v. *City of Glendale* (1975) 15 Cal.3d 328, 340 [124 Cal.Rptr. 513, 540 P.2d 609]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839]; *Western Medical Enterprises, Inc.* v. *Albers* (1985) 166 Cal.App.3d 383, 389 [212 Cal.Rptr. 434]; *Beverly Hills Firemen's Assn., Inc.* v. *City of Beverly Hills* (1981) 119 Cal.App.3d 620, 629-630 [174 Cal.Rptr. 178].)

The extrinsic evidence admitted by the court was testimony by William Henderson, Superior's president. He testified that he negotiated the provisions of the 1969 agreement with an officer of REI. With reference to paragraphs 7 and 8 of the 1969 agreement (quoted *ante,* p. 1042), Henderson testified: "The reason these clauses are in here is because Lamplighter Properties, the lessor, were [*sic*] still holding us accountable for all of the things contained in the lease, whatever they might be, and this was to try to protect ourselves because we wouldn't have the control and custody of the operation." Although "the primary concern of the whole thing is the rent," Henderson (who together with his wife owns all of Superior's stock) was also concerned for the value of the REI shares Superior would receive. The REI official told Henderson that the REI stock "had certain values, . . . that it would be restricted for a couple of years[, and t]hat after a couple of years it would be free trading stock." "[I]f anything happened, I would be able to come back in my original position to protect my own interests and to fulfill my obligations if I had any, to Lamplighter Properties. . . . I had to insert that to protect myself and come back in position."

The 1967 lease between Lamplighter and Superior was attached as "Exhibit 1" to the 1969 agreement between Superior and REI. Both documents are therefore to be construed as a single contract. (*Merkeley* v. *Fisk* (1919) 179 Cal. 748, 754 [178 P. 945]; *Housing Authority* v. *Monterey Senior Citizen Park* (1985) 164 Cal.App.3d 348, 354 [210 Cal.Rptr. 497]; *Heston* v. *Farmers Ins. Group* (1984) 160 Cal.App.3d 402, 417 [206 Cal.Rptr. 585]; *J. A. Payton* v. *Kuhn-Murphy, Inc.* (1967) 253 Cal.App.2d 278, 281 [61 Cal.Rptr. 575].) Each provision of that unified contract is to be considered in light of all other provisions. (Civ. Code, § 1641; *Bush* v. *California Conservation Corps* (1982) 136 Cal.App.3d 194, 202 [185 Cal.Rptr. 892]; *County of Marin* v. *Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319, 325 [134 Cal.Rptr. 349].)

 Defendants' construction of the anti-receivership provision as affecting only Lamplighter's unimpaired receipt of rents is untenable. The lease included a provision that "The covenants and conditions contained herein shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder."[12] A provision in the agreement specified that "REI shall assume and agrees to perform all the obligations of Superior under the lease . . . and will hold Superior harmless from any liability thereunder." The conjoint effect of these provisions clearly establishes the continued responsibility of Superior even when it was no longer the tenant in actual possession of the property.

Following its assignment of the lease to REI, Superior remained secondarily liable to Lamplighter in the event its assignee or any sublessees failed to perform any of the obligations of the transferred lease. It thus had a contingent liability to Lamplighter should rent not be paid. (See *Kendall* v. *Ernest Pestana, Inc.* (1985) 40 Cal.3d 488, 500 [220 Cal.Rptr. 818, 709 P.2d 837]; *Samuels* v. *Ottinger* (1915) 169 Cal. 209, 211-212 [146 P. 638]; *Scott* v. *Mullins* (1962) 211 Cal.App.2d 51, 55-56 [27 Cal.Rptr. 269].) Henderson's testimony demonstrates beyond any doubt that he was cognizant of this obligation. The testimony of Scott Chandler, the president of Real Estate Equities, the general partner of Lamplighter, establishes that Sun Fruit was very much a part of the transmission of rent even after it had subleased the property. According to Chandler, from 1969 onwards "we were looking to what we thought was the Rinn Corporation, now the Sun Fruit Corporation [*sic*], for the payment of our rent."

It should also be remembered that Superior's assignment of its leasehold interest to REI was not made gratuitously, but as part of a compensated exchange. The compensation Superior received was 125,000 shares of REI stock, stated in the 1969 agreement to have been acquired "for investment purposes." Although the record does not establish the precise worth of the shares, it may safely be assumed that it was considerable. Wencke testified at the trial that the shares were "now . . . worthless pieces of paper." He explained that "The creditors' claims vastly exceed the assets of the corporation, so there will be no assets left for shareholders of the corporation." Henderson largely corroborated Wencke's appraisal when he testified that

---

[12] It is clear that by force of this provision Superior could be held responsible for the actions and breaches committed by a tenant whose title derived in any fashion from Superior. This potential liability to Lamplighter would itself be more than sufficient to give Superior standing to press this litigation.

"I was unable to sell my stock *when it had a value* because it was restricted, and I still have the stock." (Italics added.)

The consequences of Sun Fruit being placed in the care of a receiver were manifold and manifest. Superior lost the presumed fiscal presence of its assignee, the party to whom Lamplighter was looking for payment of rent. Superior was therefore facing the prospect of resuming actual responsibility for such payments unless and until Sun Fruit emerged from the receivership. ■■■■ ■■ More importantly, the valuable consideration received for transfer of its leasehold assignment had become worthless, thus depriving Superior of the benefit of its bargain with REI.[13] (See fn. 14, *post*.) Both of the eventualities feared by Superior which had led to its insistence on an explicit right of reentry had come to pass. The trial court's finding that the receivership was a material breach justifying Superior's exercise of its right of reentry comports with our construction of the contract and is supported by substantial evidence. It is therefore to be sustained. (See *Glendale City Employees' Assn., Inc.* v. *City of Glendale, supra,* 15 Cal.3d 328 at p. 340; *Western Medical Enterprises, Inc.* v. *Albers, supra,* 166 Cal.App.3d 383 at p. 389; *Beverly Hills Firemen's Assn., Inc.* v. *City of Beverly Hills, supra,* 119 Cal.App.3d 620 at pp. 629-630; *Whitney Inv. Co.* v. *Westview Dev. Co., supra,* 273 Cal.App.2d 594 at p. 601.)

### (C)

■■ Defendants attempt to impeach the trial court's finding of material breach with the findings and conclusions made by the special master and

---

[13] Defendants correctly point out the unlikelihood that the trial court's finding was based upon this reasoning because Superior did not raise it at trial. Our response to defendants' criticism against accepting Superior's position is twofold. First, Superior's argument on appeal utilizes uncontradicted evidence introduced at the trial. Second, the argument is not inconsistent with the trial court's finding, which did not identify a particular consequence of the receivership as the material breach. "The rule that the appellate court is interested in the decision rather than the reasons of the lower court necessarily means that the doctrine of theory of trial will often be disregarded in order to *affirm,* not reverse, the judgment." (9 Witkin, *op. cit. supra,* Appeal, § 322, p. 333, original italics.) Application of this principle to acceptance of Superior's argument in support of the judgment is sanctioned by the established practice of this and other courts. (See *Pasadena Medi-Center Associates* v. *Superior Court* (1973) 9 Cal.3d 773, 779-780 [108 Cal.Rptr. 828, 511 P.2d 1180], text and fn. 6; *Board of Administration* v. *Superior Court* (1975) 50 Cal.App.3d 314, 319-320 [123 Cal.Rptr. 530]; *Niles Sand & Gravel Co.* v. *Alameda County Water Dist.* (1974) 37 Cal.App.3d 924, 936, fn. 12 [112 Cal.Rptr. 846]; cf. *Stockton Morris Plan Co.* v. *Carpenter* (1936) 18 Cal.App.2d 205, 213 [63 P.2d 859].) To this end, and there having been no objection by defendants concerning the precise nature of the detriment suffered by Superior from the appointment of the Nevada receiver, we are authorized to infer in support of the judgment a finding that the impairment of Superior's REI shares constituted damages amounting to a material breach. (See *Hall* v. *Municipal Court* (1974) 10 Cal.3d 641, 643 [111 Cal.Rptr. 721, 517 P.2d 1185]; *Booth* v. *Robinson* (1983) 147 Cal.App.3d 371, 377 [195 Cal.Rptr. 130]; *Union Bank* v. *Ross* (1976) 54 Cal.App.3d 290, 297 [126 Cal.Rptr. 646].)

adopted by the district court in connection with Superior's successful 1982 motion for relief from the stay previously issued by the district court at the time the federal equity receiver was appointed. Together with the de facto substitution of the Nevada receiver by the federal receiver, defendants claim that these "significant events" conclusively establish that Superior suffered no damage. As they see it, the breach was "merely technical or trivial in nature" and consequently cannot be characterized as material.

The matter of the change in receivers is quickly answered. Defendants' argument, that "the condition complained of, the Nevada receivership of Sun Fruit, had not existed for a period" of more than five years at the time the final judgment was entered, seems to imply that a receiver appointed by a federal court in California is somehow less objectionable than one appointed by a state court in Nevada. Certainly the plain language of the lease provision furnishes no basis for such a distinction. Defendants hint at no evidence suggesting that the termination of the Nevada receivership in the wake of the federal receiver being appointed entailed any reduction of Superior's responsibility as Sun Fruit's rent guarantor, or that it restored the value of the REI shares taken by Superior in exchange for surrendering its leasehold interest. If anything, the appointment of the federal receiver was even more damaging to Superior because of the accompanying stay which put a halt to Superior's nearly completed effort to obtain a judicial resolution of its claimed entitlement to the property. Furthermore, the fact that the federal receiver had been appointed on the application of the Securities and Exchange Commission stands as evidence that Sun Fruit's difficulties were almost certainly not of a minor or transitory nature, a proposition made abundantly plain by subsequent events.

The trial court took judicial notice of the special master's findings and conclusions made in connection with Superior's application that it be exempted from the stay and allowed to conclude this action against defendants. Addressing the question of whether the status quo should be preserved, the master noted that "Prior to the creation of the Nevada receivership, the terms of the master lease . . . was [sic] adhered to strictly by . . . REI and its issue," and that "the provisions of the master lease concerning the payment of rents and monies to Lamplighter Properties have been scrupulously complied with."

With respect to this action, the master stated: "Superior's injury, if any, may be characterized as a deferral or an opportunity to regain a now profitable property interest, that it had previously disposed of, by taking advantage of Walter Wencke's chicanery. If the stay remains in effect, then Superior Motels will simply continue to receive the benefit of its original

bargain with REI. . . . Superior Motel's [*sic*] position as an obligor on the master lease has not been prejudiced in any significant respect." The master's opinion was that "the Wencke receivership . . . can[not] be translated into direct injury to Superior Motels."

Turning to the "litigation between Superior Motels and Sun Fruit[,] Ltd. that is pending and presently stayed," the master characterized it as involving "purely legal issues." The master then recited some of the outstanding issues pertaining to the federal receiver's nascent action to set aside the default judgment entered against Sun Fruit (see fn. 7 and accompanying text, *ante,* p. 1046), and concluded: "This court is unable to predict with certainty how the California State Courts will ultimately decide these issues, but decide them they must."

We cannot accede to defendants' argument that the master's findings and conclusions amount to a conclusive determination that Superior suffered no damage, a determination to which the trial court was required to accord full faith and credit and which Superior is prevented by principles of res judicata and collateral estoppel from contesting. ■ "Full faith and credit must be given to a final order or judgment of a federal court. [Citations.] Such an order or judgment has the same [res judicata or collateral estoppel] effect in the courts of this state as it would have in a federal court." (*Levy* v. *Cohen* (1977) 19 Cal.3d 165, 172-173 [137 Cal.Rptr. 162, 561 P.2d 252]; see Code Civ. Proc., § 1908; *Younger* v. *Jensen* (1980) 26 Cal.3d 397, 411 [161 Cal.Rptr. 905, 605 P.2d 813]; *Martin* v. *Martin* (1970) 2 Cal.3d 752, 758-764 [87 Cal.Rptr. 526, 470 P.2d 662]; *Johnson* v. *American Airlines, Inc.* (1984) 157 Cal.App.3d 427, 430-431 [203 Cal.Rptr. 638].) The extent of such effect is governed by federal law. (See *Martin* v. *Martin, supra,* at pp. 761-762; Rest.2d Judgments, § 87.)

■ It must be remembered that the only issue before the special master (who is obviously the dominant actor even though his actions required ratification by the district court) was whether to lift the stay. His discussion of the parties' respective positions was germane to ascertaining the status quo and to determining whether it would permit resumption of the state court litigation. The master was not, however, required to adjudicate the merits of that controversy, nor did he purport to do so. He made no express reference to the issues of the materiality of any breach or damages caused thereby. In a rather oblique fashion he did make certain observations which could be construed as relating to these issues, but these comments were in the nature of asides. The sole question before him, and the sole matter he determined, was Superior's application to be relieved from the stay. If, as defendants argue, the master was deciding the ultimate question of

Superior's pending state court action, his recommendation that the stay be lifted in order that that action could be concluded makes no sense.

In light of these circumstances, the master's findings cannot be given the preclusive effect defendants wish. The master's observations concerning issues not necessary for decision of the matter before him may have been conducive to his reasoning, but they were in essence incidental, collateral, and immaterial for that decision. They were, in short, dicta. According to federal law, they therefore do not support either collateral estoppel (*Minnis v. United States Dept. of Agriculture* (9th Cir. 1984) 737 F.2d 784, 786, fn. 1; *Hicks* v. *Quaker Oats Co.* (5th Cir. 1981) 662 F.2d 1158, 1168) or res judicata. (*Norton* v. *Larney* (1925) 266 U.S. 511, 517 [69 L.Ed. 413, 417, 45 S.Ct. 145]; *Memorex Corp.* v. *Intern. Business Mach. Corp.* (9th Cir. 1977) 555 F.2d 1379, 1384; cf. *Abraham* v. *Casey* (1900) 179 U.S. 210, 219-220 [45 L.Ed.2d 156, 160, 21 S.Ct. 88].) Moreover, the only reasonable inference to be drawn from the master's recommendation that Superior be allowed to pursue its action against defendants is that he was refraining from adjudicating the merits of that controversy. This factor would also weigh against the claim defendants now press. (See *United States* v. *Seckinger* (1970) 397 U.S. 203, 206, fn. 6 [25 L.Ed.2d 224, 230, 90 S.Ct. 880]; *In re Pittsburgh & L. E. R. Co., etc.* (3d Cir. 1976) 543 F.2d 1058, 1068; cf. *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 141 [231 P.2d 6, 21 A.L.R.2d 1387]; *Bleeck* v. *State Board of Optometry* (1971) 18 Cal.App.3d 415, 429 [95 Cal.Rptr. 860].)

## V

We now turn to the question of the forfeiture of defendants' leasehold interests declared by the trial court. Defendants' contentions on this issue fall into two general categories—those relating to the proper construction of the anti-receivership provision of the lease and those affecting the denial of the motion(s) for relief from the forfeiture. Our discussion will follow this division.

### (A)

Citing the familiar principles that forfeitures are abhorred and that contracts will be strictly construed to avoid them (see Civ. Code, § 1442; *O'Morrow* v. *Borad* (1946) 27 Cal.2d 794, 800 [167 P.2d 483, 163 A.L.R. 894]; *McNeece* v. *Wood* (1928) 204 Cal. 280, 283-284 [267 P. 877]; *ABI, Inc.* v. *City of Los Angeles* (1984) 153 Cal.App.3d 669, 681-682 [200 Cal.Rptr. 563]; *Roth* v. *Department of Veterans Affairs* (1980) 110 Cal.App.3d 622, 628 [167 Cal.Rptr. 552]; *Malone* v. *Western Conf. of Teamsters Pension*

*Trust* (1980) 110 Cal.App.3d 538, 545 [168 Cal.Rptr. 210, 169 Cal.Rptr. 90]), defendants raise two contentions regarding construction of the anti-receivership provision which they claim should have been resolved in their favor to avoid a forfeiture. ▮▮▮ They first contend that the trial court's "interpretation and application" of the anti-receivership provision "constituted an unreasonable restraint on alienation." ▮▮▮ They then contend that the provision should have been construed to apply only to a receiver appointed for the tenant in possession. We find neither argument persuasive.

▮▮▮ Civil Code section 711 provides: "Conditions restraining alienation, when repugnant to the interest created, are void." This statute does not prohibit all restraints on alienation, only those which are unreasonable, i.e., not necessary to protect a security or prevent it from being impaired. (See *Kendall* v. *Ernest Pestana, Inc., supra,* 40 Cal.3d 488 at p. 498; *Wellenkamp* v. *Bank of America, supra,* 21 Cal.3d 943 at p. 948; *Tucker* v. *Lassen Sav. & Loan Assn.* (1974) 12 Cal.3d 629, 636, 639 [116 Cal.Rptr. 633, 526 P.2d 1169].) "Reasonableness is determined by comparing the justification for a particular restraint on alienation with the quantum of restraint actually imposed by it. '[T]he greater the quantum of restraint that results from enforcement of a given clause, the greater must be the justification for that enforcement.'" (*Kendall* v. *Ernest Pestana, Inc., supra,* citing and quoting *Wellenkamp* v. *Bank of America, supra,* at p. 949.) Whether a condition is reasonable, i.e., necessary to protect a party's security in a given transaction, is a question of fact, one whose resolution must be based upon evidence directed to that issue. (See *La Sala* v. *American Sav. & Loan Assn.* (1971) 5 Cal.3d 864, 878-884 [97 Cal.Rptr. 849, 489 P.2d 1113] ["[W]e cannot rule upon the validity of a . . . clause in the abstract. . . . [i]t is not so much that clause itself as the . . . application of it that will effect an invalid restraint on the alienation of property"]; *Cohen* v. *Ratinoff* (1983) 147 Cal.App.3d 321, 330.)

▮▮▮ The contention defendants now make was never raised by them in the trial court. No evidence was introduced relative to the necessity of the provision to protect either Lamplighter's or Superior's security interests.[14] No finding on that issue was made by the trial court. In these circumstances

---

[14] With its acquisition of a large block of REI stock, Superior exchanged the role of lessee for that of investor. Over and above its concern that REI not default on rent payments to Lamplighter, Superior would have an investor's abiding concern in REI's general financial stability and well-being. Any of the acts specified in the anti-receivership provision would be symptomatic of severe distress falling just short of total collapse and would thus signify a clear and present jeopardy of Superior's investment. The presence of the provision in the original lease undoubtedly reflected Lamplighter's similar concern to protect the security pledged by Superior. (See fn. 2, *ante,* p. 1041.)

this court cannot resolve defendants' contention in the first instance. (See *La Sala* v. *American Sav. & Loan Assn., supra,* 5 Cal.3d 864 at pp. 878, 882-884.)

 Defendants' contention that the provision should be construed as applicable to tenants in actual possession of leased property is based upon *Flagg* v. *Andrew Williams Stores, Inc.* (1954) 127 Cal.App.2d 165 [273 P.2d 294]. The plaintiffs in *Flagg* were the assignees of a lease. Paragraph XVI of that lease read: "Neither this Lease nor any interest therein shall be assignable or otherwise transferable by operation of law or by voluntary assignment for the benefit of creditors, it being expressly understood and agreed that said inhibition against involuntary assignment includes and comprehends any and every assignment which might otherwise be effected or accomplished by bankruptcy or receivership, or attachment or execution, or other judicial process or proceedings. If Lessees should file a voluntary petition in bankruptcy, or if Lessees should be adjudicated bankrupt, or if a receiver is appointed of or for Lessees and such receiver is not discharged within sixty (60) days following such appointment, then and in any such event Lessor may, at its option, terminate this Lease by giving written notice of such termination to Lessees."

When the *Flagg* plaintiffs were assigned this lease in 1947, they executed a written agreement with the lessor which deleted this provision and substituted the following: "Lessees shall not assign this lease, nor any right hereunder, nor sublet the premises, nor any part thereof, without the prior written consent of lessor. No consent to any assignment of this lease, or any subletting of said premises shall constitute a waiver or discharge of the provisions of this paragraph, except as to the specific instance covered thereby; nor shall this lease nor any interest therein be assignable by action of law including bankruptcy, both involuntary and voluntary, and no Trustee, Sheriff, Creditors or purchaser at any judicial sale, or any officer of any court or receiver except if appointed as herein specifically provided shall acquire any right under this lease or to the possession or use of the premises or any part thereof without the prior written consent of lessor. Any violation of this term of this paragraph shall at the option of lessor be deemed a breach of this lease."

More than four years later, the assignor was adjudicated bankrupt. The lessor then sought to terminate the Flaggs' lease, whereupon the Flaggs brought an action for declaratory and injunctive relief. According to the *Flagg* opinion:

"The trial court concluded that none of the defendants had a right to terminate the lease by reason of said adjudication of bankruptcy and that

the lease has not been terminated but continues in full force and effect. We think these conclusions of the trial court entirely correct.

"When interpreting a forfeiture clause we start with the rule announced in section 1442 of the Civil Code: 'A condition involving a forfeiture must be strictly construed against the party for whose benefit it is created.' Of two or more possible constructions, 'the construction which avoids a forfeiture should be favored.' [Citation.] A forfeiture in a lease 'is not favored. It is enforced only where there is such a breach shown as it was the clear and manifest intention of the parties to provide for.' [Citation.] There is persuasive authority to the effect that a clause which forfeits or authorizes the lessor to forfeit the lessee's interest upon bankruptcy of the lessee should, unless its language plainly otherwise requires, be interpreted as referring to the bankruptcy of the tenant in possession; i.e., the bankruptcy of the original lessee if there has been no assignment of his interest in the lease, or, if there has been an assignment, the bankruptcy of the assignee. [Citations.]

"Accordingly, when on December 2, 1947, MacArthur Properties, Inc., as lessor, approved the assignment to plaintiffs and joined with plaintiffs in deleting the text of paragraph XVI, substituting therefor a provision which for the first time forbade voluntary assignment or subletting without prior written consent of the lessor, coupled with a radical revision of the original involuntary transfer forfeiture clause, the parties to that agreement could, at most, have contemplated transfers (voluntary or involuntary) by the new lessees (plaintiffs herein) and their successors and assigns. It is not conceivable that they had in mind future transfers (voluntary or involuntary) by the original lessees.

". . . We are not concerned with the 'liability,' if any, of the original lessees for default in payment of rent or other violation by plaintiffs of the obligations the latter have assumed under the lease. We are concerned with the consequences, if any, to plaintiffs of an adjudication in bankruptcy suffered by the original lessees, or by at least one of them, long after their divestiture of all their right, title and interest in the lease and long after the revision, by the lessor and the assignees, of the forfeiture clause itself. As we have seen, there are, under the circumstances of this case, no untoward consequences to plaintiffs flowing from the bankruptcy adjudication of the original lessees or of any of them." (*Flagg* v. *Andrew Williams Stores, Inc.,* *supra,* 127 Cal.App.2d 165 at pp. 174-177.)

Although the situation in *Flagg* appears to be resonate with similarities, crucial differences preponderate. Here, the forfeiture provision, which

should be candidly recognized as such, was never modified but has instead survived the various transfers of the property in its pristine form. The extrinsic evidence recounted in part IV (B), *ante,* is pertinent for several salient points. First, Lamplighter was continuing to treat REI/Sun Fruit as responsible for the payment of rent. Second, Superior's attention for the tenant's fiscal health went beyond the rather abstract concern of a contingent guarantor of rent, to the more important role of an investor vigilant to prevent its investment from being imperiled. Third, unlike *Flagg,* it is more than "conceivable," and indeed is apparent, that the anti-receivership provision was intended to apply to future transfers. Fourth, and most importantly, this case does involve significant "untoward consequences" to the party seeking to enforce the forfeiture provision. Those consequences are the direct result of one of the precise eventualities specified in the provision. A sublessee's receivership is clearly within the anticipated ambit of the provision. This conclusion is reinforced by the provision (quoted *ante*) in the same instrument specifying that its terms shall "apply to and bind the heirs, successors, executors, administrators and assigns of all the parties."

We have no dispute with *Flagg* in the situation the court there confronted. The preceding paragraph, however, demonstrates that a series of fundamentally differing circumstances compels us to concur with the trial court that *Flagg* is distinguishable.

## (B)

Defendants Rinn Motor and Rinns Sunnyvale alone are entitled to contend that the trial court "failed to exercise and abused its discretion in denying [their] petition [] for relief from forfeiture." (See fn. 9, *ante,* p. 1048.) This contention cannot prevail.

The petition for relief had a dual statutory basis. The first was Civil Code section 3275, which provides: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

The second was Code of Civil Procedure section 1179. It reads in pertinent part: "The Court may relieve a tenant against a forfeiture of a lease, and restore him to his former estate, in case of hardship, where application for such relief is made within thirty days after the forfeiture is declared by the judgment of the Court, . . . The application may be made by a tenant or sub-tenant, or a mortgagee of the term, or any person interested in the

continuance of the term. It must be made upon petition, setting forth the facts upon which the relief is sought, and be verified by the applicant. Notice of the application, with a copy of the petition, must be served on the plaintiff in the judgment, who may appear and contest the application. In no case shall the application be granted except on condition that full payment of rent due, or full performance of conditions or covenants stipulated, so far as the same is practicable, be made."

 We address certain preliminary points before reaching the merits. Superior argues that the petition was properly denied, and may be affirmed here, by reason of untimeliness and inadequate pleading. Superior claims that the petition was untimely because it was not made within 30 days of the default judgment against Sun Fruit as required by Code of Civil Procedure section 1179, and because there was no pleading and proof justifying application of Civil Code section 3275. We find neither claim a fatal disqualification.

 It is true that the forfeiture of Sun Fruit's estate declared in the default judgment would terminate by operation of law the derivative interests of Sun Fruit's sublessees. (See *Schafer* v. *Wholesale Frozen Foods, Inc.* (1966) 242 Cal.App.2d 451, 456 [51 Cal.Rptr. 459]; *Scott* v. *Mullins, supra,* 211 Cal.App.2d 51 at pp. 54-55; *Herman* v. *Campbell* (1948) 86 Cal.App.2d 762, 765-766 [195 P.2d 801].) Nevertheless, it was not until the final judgment was entered that Rinn Motor and Rinns Sunnyvale were unambiguously notified of the loss of their estates. Their petition was filed within 30 days thereafter, as required by Code of Civil Procedure section 1179. Superior's claim that the default judgment amounted to a final determination of the entitlements of Rinn Motor and Rinns Sunnyvale to possession is at odds with its admission, made in its brief in connection with another point, that its case was proven at trial independently of the default judgment. Superior identifies no authority that the 30-day period specified in section 1179 is jurisdictional, or that any prejudice to it accrued from the timing of the petition once the final judgment was entered. These factors— together with the deep distaste for forfeitures and the fact that any defect in light of the broader scope of Civil Code section 3275 (see *Pehau* v. *Stewart* (1952) 112 Cal.App.2d 90, 99 [245 P.2d 692]; *Hignell* v. *Gebala* (1949) 90 Cal.App.2d 61, 70 [202 P.2d 378]) would not denude the trial court of all power to entertain a petition for relief—suffice to require rejection of Superior's first argument.

 Superior's second argument is equally unavailing. It is true that Civil Code section 3275 was not specifically invoked in defendants' answers, but they did pray for "such other relief as the Court deems appropriate."

The question of forfeiture figured prominently at trial, and the petition was based upon circumstances known to the trial court from the evidence produced at the trial. These circumstances combine to defeat Superior's claim that any failure of either pleading or proof was prejudicial. (See Code Civ. Proc., § 580; *Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 542-543 [145 P.2d 305]; *Johnson* v. *Tago, Inc.* (1986) 188 Cal.App.3d 507, 513 [233 Cal.Rptr. 503]; *Selby* v. *Battley* (1957) 149 Cal.App.2d 659, 664-665 [309 P.2d 120]; *Miller* v. *Modern Motor Co.* (1930) 107 Cal.App. 38, 46 [290 P. 122].)

■ Both of the statutes vest near plenary discretion in the trial court. With respect to an application for relief made pursuant to Code of Civil Procedure section 1179, the court in *Matthews* v. *Digges* (1920) 45 Cal.App. 561 [188 P. 283], stated: "The matter of granting or denying such an application is one which lies so largely in the discretion of the trial court that it would require a very clear showing of an abuse of such discretion to justify a reversal of the order made thereon." (*Id.* at p. 566; see also *Thrifty Oil Co.* v. *Batarse* (1985) 174 Cal.App.3d 770, 778 [220 Cal.Rptr. 285]; *Hignell* v. *Gebala, supra,* 90 Cal.App.2d 61 at p. 70; *Olympic Auditorium, Inc.* v. *Superior Court* (1927) 81 Cal.App. 283, 285 [253 P. 944].) Although no reported decision has expressly so held, there is no reason why the same standard should not also govern review of denials of applications for the same relief made pursuant to Civil Code section 3275. Equivalency of construction and effect are natural consequences from the statutes' relationship to the same subject. (See *Building Material & Construction Teamsters' Union* v. *Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648]; *B. W.* v. *Board of Medical Quality Assurance* (1985) 169 Cal.App.3d 219, 231 [215 Cal.Rptr. 130].) "Where the reason is the same, the rule should be the same." (Civ. Code, § 3511.)

■ To be rejected at the outset is defendants' claim that the trial court failed to exercise its discretion. Defendants point to nothing in the record which substantiates that assertion, which is rebutted by the trial court's marked liberality in permitting defendants to present extensive written and oral argument on the question.

Turning to the merits, it may be conceded that defendants could have and did present an alluring argument for relief. As they see it, the only express obligations imposed on them were the payment of rent and such gross income percentage amounts as might become due. There is no question that these obligations were, as the special master noted, complied with scrupulously. Defendants have simply abided by the terms of all applicable agreements *without* giving the least cause for dissatisfaction to either Superior or Lamplighter. At no time have either Rinn Motor or Rinns Sunnyvale been

the subject of a receivership. They had, if anything, only the most nominal and attenuated connection to the Sun Fruit receiverships. They have been commanded to surrender their well-run and profitable business, and to pay substantial monetary awards, not because of any fault of their own, but solely because of a contractual breach by an entity they could not control.

Yet innocence is not the exclusive province of defendants. Superior appears to have been perfectly content to allow defendants to remain in possession had its investment in Sun Fruit not been endangered. Confronted with clear evidence that the consideration which had prompted it to part with possession of the property had been almost totally obliterated, Superior invoked the protection of a contractual provision intended for this very eventuality. Its conduct was commercially reasonable and contractually justifiable.

Without question, it is troubling to see a business operation terminated through no fault of the operators. Yet vicarious responsibility manifested in such a form inheres in the situation of possession based upon derivative title. ▆▆▆ "A sublessee is bound by the terms and conditions of the original lease; its rights are dependent upon and subject to the sublessor's rights. . . . [R]ights under the sublease stand or fall with those of the sublessor . . . ." (*Fifth & Broadway Partnership* v. *Kimny, Inc.* (1980) 102 Cal.App.3d 195, 201 [162 Cal.Rptr. 271, 7 A.L.R.4th 580].)

▆▆▆ Had the trial court decided to relieve defendants from the forfeiture, that ruling could not be reversed as an abuse of discretion. Is the converse true? Much of the equities may favor defendants, yet this is not the only concern. Ousting defendants may work a hardship on them, but Superior has been disadvantaged by the virtual destruction of the security it took in exchange for surrendering the premises to Sun Fruit. Defendants have never offered to compensate Superior for the value of its REI shares in order that they could remain in possession. (See Civ. Code, § 3275; *Lincoln* v. *Narom Development Co.* (1970) 10 Cal.App.3d 619, 625 [89 Cal.Rptr. 128]; *Conforti* v. *Dunmeyer* (1962) 209 Cal.App.2d 41, 47 [25 Cal.Rptr. 504]; *Knight* v. *Black* (1912) 19 Cal.App. 518, 526 [126 P. 512].) Defendants are, in however attenuated a form, unavoidably connected to the party responsible for this dispute. "The trial court had the parties before it and was thus in the position—which this court is not—of determining where the equities between the parties lay. With such determination," which cannot be classed as a very clear showing that the trial court abused its discretion in denying relief from the forfeiture ordered in the final judgment, "we will not attempt to interfere." (*Matthews* v. *Digges, supra,* 45 Cal.App. 561 at p. 566.) This conclusion is fortified by our decision to reverse the monetary

awards against defendants. (See part VI, *post*.) The absence of those awards decisively tilts the balance in favor of finding no abuse in the trial court's refusal to relieve defendants from the forfeiture ordered by the judgment.

## VI

 With respect to the monetary awards made by the trial court, the parties' positions are predictable. Defendants contend that they go too far; Superior argues on its cross-appeal that they do not go far enough. An appreciation of the nature of unlawful detainer is necessary before attempting a resolution of these issues.

 Unlawful detainer is a statutory remedy whose primary feature is its expedited procedure for the recovery of possession of real property wrongfully withheld or "detained." (See *Knowles* v. *Robinson* (1963) 60 Cal.2d 620, 625 [36 Cal.Rptr. 33, 387 P.2d 833]; *Markham* v. *Fralick* (1934) 2 Cal.2d 221, 226-227 [39 P.2d 804].) To promote this end, both sides are deprived of forms of assistance that are otherwise available. "The rights and remedies afforded a landlord by the statutory provisions are given in lieu of his common law rights and remedies which included the right to enter and expel the tenant by force." (*Childs* v. *Eltinge* (1973) 29 Cal.App.3d 843, 853 [105 Cal.Rptr. 864]; accord *Deal* v. *Municipal Court* (1984) 157 Cal.App.3d 991, 995 [204 Cal.Rptr. 79]; *Custom Parking, Inc.* v. *Superior Court* (1982) 138 Cal.App.3d 90, 99 [187 Cal.Rptr. 674.) On the other hand, "a general rule has emerged that, since the sole issue before the court is the right to possession, neither a counterclaim nor a cross-complaint, nor affirmative defenses, are [*sic*] admissible in an action in unlawful detainer, even though the alleged cause contained therein grows out of the subject matter involved in the original suit. [Citations.] The purpose of this rule is to prevent tenants who have violated the covenants of their leases from frustrating the ordinary and summary remedy provided by statute for the restitution of the premises." (*Union Oil Co.* v. *Chandler* (1970) 4 Cal.App.3d 716, 721 [84 Cal.Rptr. 756]; see *Green* v. *Superior Court* (1974) 10 Cal.3d 616, 632-634 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Markham* v. *Fralick, supra,* at p. 227.) As incidents to this relief, the court may also award arrearages of rent or "damages" in an amount of the fair or reasonable rental value of the property for the period of time from the notice terminating the tenant's right of possession to judgment. (See Code Civ. Proc., § 1174, subd. (b);[15] *Lehr* v. *Crosby* (1981) 123

---

[15] Code of Civil Procedure section 1174, subdivision (b) provides: "The jury or the court, if the proceedings be tried without a jury, shall also assess the damages occasioned to the plaintiff by any forcible entry, or by any forcible or unlawful detainer, alleged in the complaint and proved on the trial, and find the amount of any rent due, if the alleged detainer be after

Cal.App.3d Supp. 1, 8-9 [177 Cal.Rptr. 96]; Cal. Eviction Defense Manual (Cont.Ed.Bar 1971) § 15.8, pp. 144-145 and authorities cited.)

Defendants first complain that the awards were neither sought by Superior in its complaint nor supported by evidence introduced at trial. This contention has elements that are replicative of defendants' previously expressed arguments that Superior suffered no damage and was improperly granted a forfeiture. We discern no reason in this context to depart from our contrary conclusions on these points. (See parts IV and V, *ante*, pp. 1050-1066.) Divested of these elements, the pleading aspect of defendants' contention is without merit.

The trial court treated the question of profits as having been put in issue by Superior's causes of action for specific performance and declaratory relief. Although this is an extremely generous reading of the complaint,[16] the court's interpretation is not insupportable. The court was in any event within its power at the conclusion of the contested trial to award a species of relief not expressly included in the complaint, Superior's request in its prayer for "such other and further relief as the court deems just" being sufficient for this purpose. (See Code Civ. Proc., § 580,; *Singleton* v. *Perry* (1955) 45 Cal.2d 489, 498-499 [289 P.2d 794]; *Johnson* v. *Tago, Inc., supra,* 188 Cal.App.3d 507 at p. 513; *Lawrence* v. *Shutt* (1969) 269 Cal.App.2d 749, 767 [75 Cal.Rptr. 533]; 4 Witkin, Cal. Procedure, *op. cit. supra,* Pleading, § 449, p. 492.) The same is true for interest: "In a contested action interest may be awarded, if the plaintiff is entitled thereto, even though the complaint contains no prayer for interest." (*Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252, 263 [90 Cal.Rptr. 169, 475 P.2d 201].)

Defendants' contention displays a sublime disregard for reality. At the time it drafted and filed its complaint, Superior was obviously and reasonably anticipating that the unlawful detainer proceeding would

---

default in the payment of rent. If the defendant is found guilty of forcible entry, or forcible or unlawful detainer, and malice is shown, the plaintiff may be awarded either damages and rent found due or punitive damages in an amount which does not exceed three times the amount of damages and rent found due. The trier of fact shall determine whether damages and rent found due or punitive damages shall be awarded, and judgment shall be entered accordingly."

[16] From our reading of the complaint, there is no mention of profits in the specific performance, unlawful detainer, or declaratory relief causes of action pleaded by Superior. The only express references to the issue are in the cause of action for the appointment of a receiver to take possession of the property "and collect the rents, issues and profits thereof" and in the prayer for this form of relief (which was denied by the trial court before the trial).

fulfill its intended function of providing an expeditious mechanism for determining entitlement to possession. This expectation was frustrated, through no fault of Superior, solely because of the district court's extended stay of the proceedings. Defendants remained in possession throughout this enforced hiatus, during which their obligation to pay rent (or reasonable rental value) continued by operation of law. (See *Ellingson* v. *Walsh, O'Connor & Barneson* (1940) 15 Cal.2d 673, 675 [104 P.2d 507]; *Samuels* v. *Ottinger, supra,* 169 Cal. 209 at p. 211; *Turell* v. *Basic Investments, Inc.* (1974) 36 Cal.App.3d 618, 620 [111 Cal.Rptr. 794]; *Samuels* v. *Singer* (1934) 1 Cal.App.2d 545, 553-554 [36 P.2d 1098]; cf. *Ross* v. *City of Long Beach* (1944) 24 Cal.2d 258, 263 [148 P.2d 649].) Confronted with this substantial lapse of time, and even in the absence of request by Superior to amend its complaint, it was proper for the trial court to update the complaint and award damages for the rental value of the premises accruing during the years in which the stay was in effect. (*Nolan* v. *Hentig* (1903) 138 Cal. 281, 283 [71 P. 440]; *Keyes* v. *Moy Jin Mun* (1902) 136 Cal. 129, 130-131 [68 P. 476]; Mason v. *Wolff* (1870) 40 Cal. 246, 250; *Flournoy* v. *Everett* (1921) 51 Cal.App. 406, 408; *Holland* v. *Eastern Outfitting Co.* (1911) 16 Cal.App. 441, 442-443 [117 P. 562].)

 In its amended statement of decision the trial court identified the basis for its award: "Under equitable principles, plaintiff is entitled to the after tax net operating profits received by . . . defendants in possession of the subject premises from November 24, 1975 to the date possession . . . is in fact delivered to plaintiff as compensation for the loss incurred because of the failure to receive possession of said premises." Defendants rather perfunctorily assert in effect that the court erred in calling equity into play.[17] This is untenable. The court had the undoubted power to take note of such considerations. "Equitable principles apply particularly where a forfeiture is sought in an action for unlawful detainer." (*Roth* v. *Morton's Chefs Services, Inc.* (1985) 173 Cal.App.3d 380, 387 [218 Cal.Rptr. 684]; accord *Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507, 514 [90 Cal.Rptr. 729, 476 P.2d 97]; *Union Oil Co.* v. *Chandler, supra,* 4 Cal.App.3d 716 at p. 722.) The California Supreme Court long ago recognized the broad scope of equity in unlawful detainer actions: " 'If such an equitable power is in a court in cases of this class, of which we have no doubt, no reason is apparent why such equitable power may not be extended into a full examination of all the equities involved, to the end that exact justice may be done.' " (*Schubert* v. *Lowe* (1924) 193 Cal. 291, 295 [223 P. 550], citing and quoting *Gray* v. *Maier & Zobelein Brewery* (1906) 2 Cal.App. 653, 658 [84 P. 280].)

---

[17] Most of defendants' claim is devoted to arguing that the equities favored them and that right to possession should not have been forfeited. This claim was dealt with in part V, *ante.*

Accordingly, equity was legitimately employed by the trial court in fashioning appropriate relief. Whether the relief actually awarded can be upheld is, however, an entirely different matter.

■ This court recently had occasion to state: "A trial court's equity powers are formidable . . . but must be exercised pursuant to the principle that equity follows the law." (*Johnson* v. *Tago, Inc., supra,* 188 Cal.App.3d 507 at p. 518.) ■ The heart of defendants' remaining contentions is that the trial court's award of "after tax net operating profits" exceeded the legally permissible recovery in several respects. Specifically, they urge that the trial court erred in (1) awarding net profits as the equivalent of the property's fair rental value; (2) enhancing the award with prejudgment interest; and, (3) extending the award of net profits beyond entry of the judgment until the date possession was surrendered. Each of these claims is well taken.

■ The measure of damages to which a landlord is entitled for an unlawful detainer is the reasonable rental value of the property. (See *Stockton Morris Plan Co.* v. *Carpenter, supra,* 18 Cal.App.2d 205 at p. 210; *Samuels* v. *Singer, supra,* 1 Cal.App.2d 545 at p. 554; *Lehr* v. *Crosby, supra,* 123 Cal.App.3d Supp. 1 at p. 9; *Glouberman* v. *Coffey* (1955) 138 Cal.App.2d Supp. 906, 907-908 [292 P.2d 681]; cf. Civ. Code, § 3334.) "Ordinarily, it might be said that the agreed rent is evidence of the rental value, but . . . such rental value may be greater or less than the rent provided for in the lease." (*Harris* v. *Bissell* (1921) 54 Cal.App. 307, 312-313 [202 P. 453]; accord *Lehr* v. *Crosby, supra;* see *Karp* v. *Margolis* (1958) 159 Cal.App.2d 69, 75 [323 P.2d 557]; *D'Amico* v. *Riedel* (1949) 95 Cal.App.2d 6, 9 [212 P.2d 52]; *Haig* v. *Hogan* (1947) 82 Cal.App.2d 876, 878 [187 P.2d 426].)

■ ■ No evidence was introduced concerning the reasonable rental value of the property. Upon declaring the forfeiture of defendants' leasehold interests, the trial court appears to have thereafter proceeded on the premise that all "rents, issues and profits" were the measure of the property's reasonable rental value. This was error.

In *People* v. *Gustafson* (1942) 53 Cal.App.2d 230 [127 P.2d 627], the court construed former Political Code section 3773, which gave the State Controller the power "to lease and rent and to receive and collect all rents, issues and profits arising in any manner from property" which had been

deeded to the state for nonpayment of taxes. After noting that "the phrase 'rents, issues and profits' has a well understood meaning and refers to rents collected by the party in possession, and/or the net profits accruing to him from said property, and *not to the rental value or the value of use and occupation*," the court concluded that "the right to 'receive and collect all rents, issues and profits' conferred by section 3773 of the Political Code is clearly distinguishable from a right to exact payment for use and occupancy, . . ." (*Id.* at pp. 239-240, italics added.) Although *Gustafson* is not controlling, its distinction between reasonable rental value and "rents, issues and profits" is absolutely clear and directly relevant for present purposes. Profits are not synonymous with rental value.

 Superior stoutly maintains that the judgment it holds is not for unlawful detainer but for restitution incident to specific performance of its contractual right of reentry. At this point Superior may well wish that this were so. The incontestable reality is otherwise. The caption of Superior's complaint identified it as being "for unlawful detainer." After reciting pertinent factual circumstances Superior alleged that "the foregoing constitutes unlawful detainer within the terms and meaning of . . . Code of Civil Procedure Section 1161." Attached as an exhibit to Superior's complaint was the "Three Day Notice To Quit" sent to Sun Fruit. The text of that notice expressly stated that the notice was "[p]ursuant to Code of Civil Procedure Section 1161."

 "[F]or many years the California courts have adhered to the principle that the unlawful detainer statute is strictly construed and that relief not authorized by that statute may not be given due to the summary nature of the proceedings." (*Castle Park No. 5* v. *Katherine* (1979) 91 Cal.App.3d Supp. 6, 9 [154 Cal.Rptr. 498]; accord *Saberi* v. *Bakhtiari* (1985) 169 Cal.App.3d 509, 515 [215 Cal.Rptr. 359]; see *Chase* v. *Peters* (1918) 37 Cal.App. 358, 360 [174 P. 116] ["The mode and measure of the plaintiff's recovery are . . . limited"].) Collateral matters are excluded (see *E. S. Bills, Inc.* v. *Tzucanow* (1985) 38 Cal.3d 824, 830 [215 Cal.Rptr. 278, 700 P.2d 1280]), particularly those seeking damages for breaches of lease provisions. "It is well settled that damages allowed in unlawful detainer proceedings are only those which *result from* the unlawful detention and accrue during that time. [Citation.] Although a lessee guilty of unlawful detention may have also breached the terms of the lease contract, damages resulting therefrom are not necessarily damages resulting from the unlawful detention. As such, [a lessor] is precluded from litigating a cause of action for these breaches in unlawful detainer proceedings." (*Vasey* v. *California Dance Co.* (1977) 70 Cal.App.3d 742, 748 [139 Cal.Rptr. 72], italics in original; see

*Roberts* v. *Redlich* (1952) 111 Cal.App.2d 566, 569 [244 P.2d 933].) "An unlawful detainer action is not based upon contract [citations]; it is a statutory proceeding and is governed solely by the provisions of the statute creating it." (*Fifth & Broadway Partnership* v. *Kimny, Inc., supra,* 102 Cal.App.3d 195 at p. 200.) Those statutory requirements "must be followed strictly, otherwise a landlord's remedy is an ordinary suit for breach of contract with all the delays that remedy normally involves and without restitution of the demised property." (*Cal-American Income Property Fund IV* v. *Ho* (1984) 161 Cal.App.3d 583, 585 [207 Cal.Rptr. 532].) The same is true for specific performance of the provisions of a lease. (See *Mobil Oil Corp.* v. *Handley* (1978) 76 Cal.App.3d 956, 965-967 [143 Cal.Rptr. 321], text and fn. 1.)

That the circumstances of this case are highly unusual, if not unique, may be conceded. It is true that defendants had notice that their leasehold interests were imperiled once the trial court filed its memorandum of decision on March 1, 1977. The federal receiver was appointed a mere two days later. This severely restricted defendants' freedom of maneuver: operation of the premises was a valuable asset entrusted to the receiver, whose subsequent actions demonstrate to a near-certainty that he would not consent to its being relinquished. Defendants were in effect compelled to remain in possession. Nevertheless, defendants continued to pay rent. The long freeze imposed by the district court obviously entailed a complete nullification of the summary advantages of the unlawful detainer remedy. No action, however, was taken by Superior to modify its litigation strategy accordingly. Superior's complaint was never amended, nor was it superseded by a supplementary pleading. There is no evidence that Superior commenced another action, whether for mesne profits, constructive trust, or otherwise, to obtain restitution of the funds defendants had collected while still in possession. In short, Superior sought unlawful detainer and nothing but unlawful detainer. Superior's response to the prolonged delay was to cover its inertia by formulating a position totally at odds with the goals and purposes of unlawful detainer. Superior was more than happy to claim the benefits of that statutory remedy, yet it now attempts to avoid its corresponding limitations. Superior's rights are delimited by the detainer it sought and obtained.

For the reasons previously discussed, the trial court correctly concluded that Superior was entitled to regain possession of the property. Superior was also entitled to receive a reasonable rental value for the property during the period that its right to possession was denied. It was not entitled to automatic awards of the "rents, issues and profits" collected by

defendant because, as we have seen, that criterion is not synonymous with reasonable rental value. (See *People* v. *Gustafson, supra,* 53 Cal.App.2d 230 at p. 239.) Net profits may be an appropriate measure of damages in a breach of contract action (see *Mayes* v. *Sturdy Northern Sales, Inc.* (1979) 91 Cal.App.3d 69, 84 [154 Cal.Rptr. 43]), but it was error to import this standard into an unlawful detainer action and thereby supplant the standard of reasonable rental value. The error in making the awards granted to Superior cannot be justified by reference to equitable principles (see *Johnson* v. *Tago, Inc., supra,* 188 Cal.App.3d 507 at p. 518; *Balassy* v. *Superior Court* (1986) 181 Cal.App.3d 1148, 1153 [226 Cal.Rptr. 817]) and must be considered prejudicial. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Chase* v. *Peters, supra,* 37 Cal.App. 358 at pp. 362-363.) ▮ This error does not require a reversal of the entire judgment, only those portions of the judgment specifying the awards to be recovered by Superior. This limited reversal will be accompanied with a remand with directions for the trial court to determine and fix the reasonable rental value of the premises during which Superior was entitled to possession, taking into account the monthly rent payments already made by defendants.[18] We now address Superior's remaining contentions for the trial court's guidance on the remand.

▮ With respect to the matter of prejudgment interest, the trial court's award had a dual basis. The court concluded that Superior "is entitled to prejudgment interest in this action as a matter of right" pursuant to Civil Code section 3287, subdivision (a), and that "[a]lternatively, a discretionary award . . . is appropriate" according to subdivision (b) of that statute.[19] Defendants contend that neither of these purported grounds supports the award. ▮ ▮ As regards subdivision (a), defendants are correct. "This section does not authorize prejudgment interest as a matter of law where the amount of damages depends upon a judicial

---

[18] In *Harris* v. *Bissell, supra,* 54 Cal.App. 307, the defendant lessee breached a lease by planting a crop of grain on land to be used for pasturing sheep. A judgment in unlawful detainer for the plaintiff lessor awarded him damages consisting of the rent specified by the lease *and* the net value of the crop. This was held to be excessive, because " 'defendant would be paying rent to the plaintiff for the privilege of raising a crop for plaintiff.' " (*Id.* at p. 312.) We commend this holding to the trial court for its consideration on the remand.

[19] Civil Code section 3287 provides in pertinent part: "(a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. This section is applicable to recovery of damages and interest from any such debtor, . . .

"(b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

determination based upon conflicting evidence." (*Polster, Inc.* v. *Swing* (1985) 164 Cal.App.3d 427, 434 [210 Cal.Rptr. 567]; accord *Iverson* v. *Spang Industries, Inc.* (1975) 45 Cal.App.3d 303, 311 [119 Cal.Rptr. 399].) The amount of the reasonable rental value to be determined by the trial court falls within this rule. (*Stockton Morris Plan Co.* v. *Carpenter, supra,* 18 Cal.App.2d 205 at pp. 213-214; *Samuels* v. *Singer, supra,* 1 Cal.App.2d 545 at pp. 554-555; cf. *Sullivan* v. *Wellborn* (1948) 32 Cal.2d 214, 220 [195 P.2d 787]; *Karp* v. *Margolis, supra,* 159 Cal.App.2d 69 at pp. 75-76; *Rose* v. *Hecht* (1949) 94 Cal.App.2d 662, 665-666 [211 P.2d 347].) ■ As regards subdivision (b), that provision applies only to "damages based upon a cause of action in contract . . . ." Defendant's obligation to pay Superior reasonable rental value is not based upon a contract, but upon the obligation imposed by law to compensate for occupancy of the premises. (See *Ellingson* v. *Walsh, O'Connor & Barneson, supra,* 15 Cal.2d 673 at p. 675; *Samuels* v. *Ottinger, supra,* 169 Cal. 209 at p. 211; *Fifth & Broadway Partnership* v. *Kimny, Inc., supra,* 102 Cal.App.3d 195 at p. 200.) Prejudgment interest is thus not allowed by either subdivision of Civil Code section 3287.

■ Also meritorious is defendants' argument that the trial court erred by ordering them to pay "future damages" beyond the date of the judgment until such time as they return possession of the premises to Superior. Such recovery is not permitted in unlawful detainer. (*Cavanaugh* v. *High* (1960) 182 Cal.App.2d 714, 722-723 [6 Cal.Rptr. 525]; *Roberts* v. *Redlich, supra,* 111 Cal.App.2d 566 at pp. 569-570; *Pfitzer* v. *Candeias* (1921) 53 Cal.App.737, 741 [200 P. 839]; *Lehr* v. *Crosby, supra,* 123 Cal.App.3d Supp. 1 at p. 10.)

A final contention by defendants concerns a computational error in fixing the awards. In light of our decision to reverse and remand the portions of the judgments affecting the awards, this contention becomes moot. The same is true for Superior's cross-appeal.

Those portions of the judgment providing that plaintiff Superior shall recover from defendants Rinn Motor, Rinns Sunnyvale, and Walter Pabst "after tax net operating profits received by said defendants from the subject premises from November 24, 1975 to June 1, 1983, . . . and continuing to the date on which possession of said premises is in fact delivered to plaintiff, together with interest thereon at the rate of 10 per cent per annum from the dates received by said defendants until said sums are paid to plaintiff" are reversed. The cause is remanded to the trial court with directions to determine the reasonable rental value of the premises for that period. The

judgment is affirmed in all other respects. The order denying relief from forfeiture is also affirmed. The purported appeal from that order by defendant Walter Pabst is dismissed. The parties shall bear their respective costs on appeal.

Channell, J., and Sabraw, J., concurred.

A petition for a rehearing was denied November 25, 1987, and the petition of plaintiff and appellant for review by the Supreme Court was denied January 20, 1988.