Filed 2/11/25

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| PULSE TECHNOLOGY CONSULTING GROUP, INC., | C098036 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. 34201900264455CUCLGDS) |
| v. | |
| SKOWRON & BUNNING, LLP, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Kenneth Mennemeier, Judge. Affirmed.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of: (1) the entirety of the second through sixth paragraphs under the Discussion section (section II), beginning on page 10 of the opinion; (2) parts A, B, C, D, and E of the Discussion section (section II).

1

Law Offices of Nilesh Choudhary and Nilesh Choudhary for Defendant, Cross-complainant and Appellant.

The Sterling Law Group, Timothy J. Kooy, and Stephen J. Slocum for Plaintiff, Cross-defendant and Respondent.

Pulse Technology Consulting Group, Inc. (Pulse) and Skowron & Bunning LLP (S&B) entered into an agreement for information technology services in November 2018. The agreement had a fixed term of 36 months. S&B terminated the agreement after only four months.

Litigation ensued. Pulse sued S&B for breach of contract and related causes of action. S&B countersued for breach of warranty, among other things. Following a five-day bench trial, the trial court found S&B breached the agreement and awarded damages to Pulse in the amount of $54,080. The trial court rejected all of S&B's cross-claims against Pulse. The trial court subsequently awarded attorney's fees to Pulse in the amount of $64,750. S&B appeals both the judgment and attorney's fee award. We will affirm.

## I. BACKGROUND

Pulse is an information technology services company. Pulse helps small businesses manage their computer systems. Among other things, Pulse helps clients understand their hardware and software needs, and helps them to procure and install appropriate resources. It also helps clients maintain their computer systems and networks.

Pulse relies on a business model common in the information technology services industry. It provides ongoing maintenance and oversight services for a monthly fee, over a predetermined period of time. This model ensures that clients pay fixed monthly rates but requires that Pulse spend considerable time addressing their needs at the beginning of

2

the contract term, often incurring significant costs in the process. To recoup those costs, Pulse requires that clients enter into fixed term agreements. Chris Thomas owns Pulse.

Pulse had a client relationship with Bunning LLP, an accounting firm with offices in Citrus Heights and elsewhere. Joseph Skowron owned another accounting firm in Sacramento. Skowron purchased Bunning LLP's Citrus Heights office in November 2018 and named the newly combined firm Skowron & Bunning LLP.

## A.     The Master Services Agreement

Pulse and S&B entered into a master services agreement on November 7, 2018. The master services agreement contemplated that Pulse would provide information technology support services for 36 months. Those services were identified on an attachment to the master services agreement and included PC management, email spam management, antivirus management, password management, server management, backup and disaster recovery management, network management, application management, and remote access security. The master services agreement established a monthly rate of $3,314, which would be reduced by 10 percent (to $2,991) for payments made electronically. The master services agreement further contemplated that the agreement could not be modified, "except by in writing and signed by both parties." As we shall see, no such writing was ever executed.

When Thomas signed the master services agreement, he understood Pulse would be providing information technology support to S&B's Citrus Heights office, as Pulse had previously done for Bunning LLP. Indeed, the master services agreement specifically stated Pulse was to support a single location, and Skowron never said anything in precontract discussions to suggest otherwise.

## B.     The Parties' Performance

After entering into the master services agreement, Pulse got to work providing information technology support services to S&B's Citrus Heights office. Among other things, Pulse maintained the office computer network, handled service calls, and migrated

3

S&B's billing software from one platform to another. S&B does not challenge Pulse's performance of these services. Instead, S&B argues Pulse failed to timely respond to other service requests, arguably outside the scope of the master services agreement. We describe those requests—and Pulse's response—in rough chronological order below.

On November 8, 2018, Skowron sent Thomas an email explaining he had been using an older version of Microsoft Outlook in Sacramento (Microsoft Outlook 2007) but wanted to migrate his email files to the newer version used in Citrus Heights (Microsoft 365). Skowron emphasized the importance and delicacy of the transfer, stating: "I can't afford to lose the information." Thomas understood the email migration would present special challenges, as it was not unusual for users to lose up to 10 percent of their information when migrating from one platform to another.

On November 13, 2018, Skowron emailed Thomas to ask whether he had "an inventory of PCs" in the Citrus Heights office. Skowron added that he wanted to "look at refresh rate and minimum requirements." In other words, he was considering upgrading some of the computers. Thomas responded that Pulse would compile the information. Skowron followed up by email on November 16, 2018, writing: "When will I get the inventory of computers? I need to get new ones and I don't want to lose the holiday sales."

A Pulse staff member prepared an Excel spreadsheet listing the computers in the Citrus Heights office. Thomas gave the spreadsheet to Skowron at an in-person meeting on November 29, 2018. After the meeting, Skowron sent Thomas an email attaching screenshots from several computers showing the processing speeds and memory for each. Shortly thereafter, on December 4, 2018, Thomas sent Skowron a "[h]ardware [l]ifecycle [r]eport" containing information that would be helpful in determining which computers should be replaced.

Somewhere along the line, Thomas learned Skowron wanted to connect the Sacramento and Citrus Heights networks to allow data sharing between the two offices.

4

On December 12, 2018, Skowron approved the purchase of hardware equipment and a software license for a virtual private network (VPN) connecting Sacramento and Citrus Heights. Pulse ordered the equipment within a day or two. As we shall see, however, the equipment was not delivered to Pulse for several weeks due to shipping delays.

Skowron turned his attention to the email migration issue one weekend in late December 2018. He decided to take matters into his own hands. He went to S&B's Sacramento office, where he spent several hours uploading email files to an online file hosting service. He then drove to the Citrus Heights office, where he downloaded the files. The entire process took Skowron eight to 10 hours, spread over two days. The record does not reveal whether all the email files survived the transfer.

On December 23, 2018 (a Sunday), Skowron sent Thomas an email with the subject line, "Open Items." The email acknowledged the successful installation of disaster recovery equipment in Citrus Heights and went on to say: "PC Purchase – Haven't heard from you, so I'll take care of it." Thomas immediately forwarded Skowron's email to his business partner, Michael VanCamp. Thomas asked that VanCamp reach out to Skowron to offer help, adding, "I think I was unclear of the task . . . ." VanCamp promptly called and emailed Skowron, attaching a proposal for the purchase of six personal computers. Skowron would later say the proposal was "too little, too late."

On January 7, 2019, Skowron emailed Thomas: "When we met in early December, I had 4 things I wanted done before 1/1 . . . . Basically, nothing has been completed. You might have done work in the background, but execution is what counts. We can discuss later. [¶] My tax season starts early and my first appointment is today.

I'll provide my availability later today for a meeting this week to discuss."[1]  A meeting was set for later that week.

In the meantime, Pulse received the VPN equipment needed to connect the Sacramento and Citrus Heights offices.  On January 8, 2019, Thomas informed Skowron by email that the VPN equipment "was finally delivered yesterday," and was "ready to be installed."  An installation date was scheduled.  On January 16, 2019, Thomas reported to Skowron:  "The new router is installed at the Sacramento office.  The Internet is up.  The VPN configured."  All that remained, Thomas said, was to ask Comcast to allow the VPN to use the wireless gateway.

C.     *Termination of the MSA*

When Skowron learned delivery and installation of the VPN equipment would be delayed, he decided he'd "had enough."  Sometime in the first half of January 2019, he solicited a proposal from Fuse3 Communications (Fuse3) to take over for Pulse.  Fuse3 provided a quote, which Skowron accepted on January 18, 2019.

Later that day, Skowron sent Thomas an email titled, "TERMINATION NOTICE."  He wrote:  "When I first signed the master service agreement ('MSA') executed with Pulse Technology Consulting Group ('Pulse') on November 1, 2018 [*sic*], I anticipated that PULSE's work would be provided in a timely manner and of sufficient quality based on your prior relationship with Bunning.  Unfortunately, the experience with PULSE has been completely unacceptable.  Basic tasks, such has [*sic*] the transition from Outlook 2007 to Office 365 were delayed and I had to complete this task while

---

[1]  Skowron's January 7, 2019 email forwarded another email, dated November 27, 2018, in which Skowron identified six things he wanted to "discuss and develop plans for." Those things were:  (1) "Server Upgrade," (2) "PC inventory," (3) "Server partition," (4) "Connecting with my Sacramento office for Phones and Data (shared drive)," (5) "Installing instant messaging on machines," and (6) "Bill quick issues."  The November 27, 2018 email does not specify a date by which any of these plans should be developed, but closes by saying, "we really need to move quickly on this."

other tasks, including data sharing between the Citrus Heights and Sacramento offices remain incomplete and overdue (discussed that these and other items needed to be completed before the January 2019 tax season kick off)."

"Based on this and other experiences," Skowron continued, "I am terminating the MSA to avoid the business disruption associated with PULSE's deficient performance and retain[ing] another service provider. The anticipated transition should be completed by February 28, 2019[,] so I am willing to meet the terms of the MSA until that date. If there are out of pocket costs that require reimbursement, please forward the costs so I may review and bring this matter to a resolution."

Thomas responded to Skowron promptly by email. He lamented the prospect of losing S&B as a client and offered to meet in person to discuss next steps. A meeting was set for January 22, 2019. At the meeting, Thomas tried to determine which issues had not been addressed to Skowron's satisfaction. Skowron responded that his specific concerns no longer mattered; he wanted to terminate the master services agreement regardless.

On January 24, 2019, Skowron notified Thomas by email that S&B would be transitioning its information technology needs to Fuse3. He asked that Pulse cooperate in the transition. Thomas responded that Pulse did not wish to end the client relationship. Nevertheless, Pulse cooperated with Fuse3. S&B paid Pulse through February 2019.

D.      *Pulse's Complaint and S&B's Cross-Complaint*

Pulse retained Collection at Law, Inc., a Professional Law Corporation (the collection firm), which filed a complaint against S&B in September 2019. The complaint asserts causes of action for (1) an open book account, (2) account stated, (3) reasonable value of services rendered, and (4) breach of contract. The complaint also prays for attorney's fees. S&B answered the complaint, denying all material allegations.

S&B filed a cross-complaint against Pulse in October 2019. The cross-complaint asserts causes of action for (1) breach of warranty, (2) breach of contract, (3) unfair

7

business practices, and (4) declaratory relief. The cross-complaint also prays for attorney's fees. Pulse answered the cross-complaint, denying all material allegations.

E.     Bench Trial

The matter was tried to the trial court over five days in December 2022. Thomas and Skowron—who were the only witnesses—testified substantially as described *ante*. Thomas also testified that Pulse developed a plan for migrating Skowron's emails from Sacramento to Citrus Heights, and orally conveyed the plan to Skowron. Skowron, for his part, testified he never received any such plan.

Thomas also testified about Pulse's damages and attempts to mitigate them. As relevant here, Thomas testified over S&B's objection to certain out-of-pocket costs set forth on a two-page document entitled, "Skowron-Hard Costs" (the cost summary). Thomas explained the cost summary had been prepared by Pulse for use by the collection firm in settlement discussions with S&B. The cost summary contains screenshots of payment pages and invoice details from several vendors, including Datto, Inc. (Datto).[2] Thomas also testified to some of the underlying invoices, including the Datto invoice, again over S&B's objection. Although Thomas said the invoices had been paid, Pulse presented no documentary evidence of the payments.

Thomas further testified that Pulse purchased hardware from Datto, which was used as part of S&B's back up and disaster recovery system. Thomas also testified, in response to questions by the trial court, that Pulse could have redeployed the Datto hardware to another client, but was unable to do so, as S&B failed to respond to requests to return it.

By the end of trial, Pulse had narrowed the scope of the complaint to a single cause of action for breach of contract. S&B continued to assert causes of action for

---

[2] The cost summary also contains an embedded chart purporting to summarize Pulse's out of pocket costs. The trial court did not admit that portion of the cost summary.

breach of contract, breach of warranty, and declaratory relief, but withdrew its cause of action for unfair business practices.

F.      Statement of Decision

The trial court issued a written ruling and statement of decision on February 7, 2023. The trial court found Pulse sustained its burden of proof on the cause of action for breach of contract. The trial court rejected S&B's argument that Pulse breached the master services agreement first by failing to timely perform some tasks (namely, the PC inventory, email migration, and VPN installation), finding, "to whatever extent it might be said that Pulse's performance breached its obligations under the [master services agreement], any such breach was not 'material' and therefore constituted only a 'partial breach.'"

The trial court then considered S&B's cross-complaint. The trial court spent most of its time on S&B's cause of action for breach of warranty, as does S&B.[3] That cause of action was based on a warranty in the master services agreement whereby Pulse agreed to perform "in a professional and workmanlike manner." The trial court found Pulse was not unprofessionally slow in responding to Skowron's request for an inventory of PCs. The trial court further found the email migration and VPN installation were outside the scope of the master services agreement.

The trial court then turned to the question of damages. Specifically, the trial court found Pulse incurred damages in the amount of $54,080, which represented the sum of Pulse's lost profits for the 32 months for which S&B made no payments ($28,714) and its unamortized and unrecouped out-of-pocket costs ($25,366). The latter amount included $2,173 for the unamortized cost of the Datto hardware.

---

[3] S&B does not appear to challenge the trial court's rejection of its cause of action for breach of contract or request for declaratory relief.

*G. Attorney's Fees*

Pulse filed a motion for attorney's fees pursuant to Civil Code section 1717. The motion sought an award of attorney's fees in the amount of $141,070 (an amount later reduced to $124,160) and relied on section 10 of the master services agreement, which provides, in part: "Client will be responsible for all third party costs incurred by PULSE to collect overdue invoices." S&B opposed the motion, arguing section 10 does not provide for attorney's fees. The trial court concluded section 10 impliedly authorizes attorney's fees and identified Pulse as the prevailing party. The trial court later determined that Pulse was entitled to an award of attorney's fees in the amount of $64,750.

S&B appeals, challenging both the judgment and the award of attorney's fees.

## II. DISCUSSION

S&B advances several arguments on appeal. First, S&B argues the trial court's statement of decision was incomplete and inconsistent with the evidence. Second, S&B argues substantial evidence does not support the trial court's determination that any breach of the master services agreement by Pulse was not material. Third, S&B argues the trial court erred in finding it failed to carry its burden of proof on the cross-claim for breach of warranty. Fourth, S&B argues the trial court erred in concluding Pulse was entitled to recover the cost of the Datto hardware. Fifth, S&B argues the trial court erred in denying its motions in limine to exclude the cost summary and invoices. Finally, S&B argues the trial court erred in awarding attorney's fees to Pulse. We will address these arguments momentarily.

Before we begin, a word on the briefing. S&B's briefs violate the California Rules of Court and established standards of appellate practice. "Perhaps the most fundamental rule of appellate law is that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) " 'This means that an appellant must do more than assert

10

error and leave it to the appellate court to search the record and the law books to test his claim.' " (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619.) " 'To prevail on appeal, an appellant must establish both error and prejudice from that error. [Citation.] In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 597.) S&B falls short of these requirements in several ways.

First, S&B fails to provide adequate citations to the record. California Rules of Court, rule 8.204(a)(1)(C) provides that appellate briefs must "[s]upport *any* reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Thus, all references to matters in the record must be supported by adequate citations, regardless of where in the brief they occur. (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 970 [" 'Any statement in a brief concerning matters in the appellate record—whether factual or procedural and no matter where in the brief the reference to the record occurs—*must be supported by a citation to the record*' "].) The opening brief provides adequate record citations in the statement of facts but generally omits them from the argument sections. This approach is improper. "Rule 8.204(a)(1)(C) [of the California Rules of Court] is intended to enable the reviewing court to locate relevant portions of the record 'without thumbing through and rereading earlier portions of a brief.' [Citation.] To provide record citations for alleged facts at some points in a brief, but not at others, frustrates the purpose of that rule, and courts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted." (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8.)

Second, the opening brief's legal arguments are conclusory and unsupported by pertinent legal authority. Much of S&B's argument recounts the evidence at length, usually without citation to the record, then summarily concludes the trial court erred, without explanation or analysis. This, too, is insufficient. "Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99; see also *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 ["When an issue is unsupported by pertinent or cognizable legal argument, it may be deemed abandoned and discussion by the reviewing court is unnecessary"]; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"].) "We are not bound to develop appellants' arguments for them." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Finally, S&B fails to observe the standards governing an appellant's challenge to the sufficiency of the evidence. As the reviewing court, we start with the presumption that the record contains evidence to sustain every finding of fact. (*LA Investments, LLC v. Spix* (2022) 75 Cal.App.5th 1044, 1061.) Consequently, "[a] party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze all the evidence on that point, both favorable and unfavorable." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) "When [an] appellant's opening brief states only favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact." (*LA Investments, LLC v. Spix, supra,* at p. 1061.) S&B's opening brief runs roughshod over these requirements as well.

On the whole, S&B's briefing failures have frustrated our review, and we would be within our rights to disregard most of S&B's opening brief. Nevertheless, we will address S&B's arguments to the extent we can reasonably discern them.

*A.     Statement of Decision*

S&B argues the trial court's statement of decision contains errors and omissions. Specifically, S&B suggests the statement of decision fails to consider the possibility the parties agreed to modify the master services agreement to encompass Skowron's additional requests, fails to account for evidence that Pulse knew S&B wanted to purchase new computers after sending the hardware lifecycle report, overlooks evidence contradicting Thomas's testimony that he orally conveyed an email migration plan to Skowron, and misunderstands the significance of S&B's argument that Pulse failed to inform Skowron the VPN hardware would be delivered late. None of these arguments succeed.

We review a trial court's factual findings in its statement of decision—both express and implied—for substantial evidence. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.) Substantial evidence is "evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." (*Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 507.) "Where a statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.) We must " 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations]. Moreover, findings of fact are liberally construed to support the judgment." (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.)

S&B argues the statement of decision fails to consider ways the parties could have modified the master services agreement to encompass additional tasks, such as those performed in the Sacramento office. We disagree. The statement of decision specifically refers to section 7 of the master services agreement, which provides the agreement "may not be modified except by in writing and signed by both parties." The statement of decision then observes there was "never any such modification." The statement of decision thus rejects any theory that the parties modified the master services agreement to encompass additional tasks. The trial court was not required to separately consider all the ways in which the parties could have modified the master services agreement (e.g., through waiver or course of conduct). It is enough that the trial court found no such modification was made. (See, e.g., *Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565-566 ["special findings are not required on every subsidiary matter on which evidence is received at trial, even though the subsidiary matter is relevant to the ultimate issues of fact. [Citation.] For example, where damages are the product of many interwoven elements, the trial court is not required to make separate findings on each element"].)

S&B next argues the statement of decision fails to account for evidence Pulse was aware of Skowron's interest in purchasing new computers and understood the ball was in its court to follow up with him, even after sending the hardware lifecycle report. S&B is wrong. The statement of decision reviews email correspondence between Skowron and Thomas and notes that Skowron originally requested an "inventory" of computers, which Pulse provided. Thomas then came to understand that Skowron wanted something else— a hardware lifecycle report—which would contain more detailed information regarding which computers should be replaced. Pulse generated the hardware lifecycle report, which Thomas emailed to Skowron on December 4, 2018, with a note saying, "Any questions please let me know." Pulse heard nothing from S&B until December 23, 2018, when Skowron wrote: "PC Purchase – Haven't heard from you, so I'll take care of it." Pulse responded to Skowron with a proposal for new computers within two hours. As the

14

statement of decision observes: "It appears that, after Thomas provided Skowron the [l]ifecycle [r]eport, neither Thomas nor Skowron followed up with the other. Insofar as Skowron never told Thomas exactly what he wanted from Pulse and never responded to Thomas's December 4 offer to help, the Court finds no basis to conclude that Pulse breached any contractual obligation to S&B." The statement of decision thus considers the very evidence said to have been overlooked. That the trial court drew different conclusions from the evidence than S&B does not establish any problem with the statement of decision.

S&B next argues the statement of decision overlooks inconsistencies in Thomas's testimony concerning the email migration plan. Again, we disagree. S&B perceives inconsistencies between an email dated December 4, 2018, in which Thomas said he would send an email migration plan later that day, and Thomas's testimony that he orally conveyed such a plan, which Skowron denies. But the statement of decision specifically says the trial court found "no need to resolve this question of fact," and S&B does not suggest the court was wrong in so finding. Furthermore, as Pulse observes, the trial court found Thomas's testimony credible. Therefore, any inconsistencies in the evidence would have been resolved in favor of Pulse, had such resolution been necessary. We will not second guess either the trial court's determination that resolution of the factual issue was unnecessary or that Thomas's testimony was credible.

S&B next argues the statement of decision "omits critical issues" concerning the late delivery of VPN hardware. Specifically, S&B argues Pulse never informed Skowron that delivery was delayed. The statement of decision rejects a similar argument, noting "[t]his case does not involve tort claims for alleged violations of any alleged duty to disclose." S&B now argues the trial court misunderstood the issue but does not make any attempt to explain how or why. As previously discussed, we are not bound to develop legal arguments for the parties and decline to do so here. (*Jones v. Superior Court, supra*, 26 Cal.App.4th at p. 99.)

15

*B.      Sufficiency of Evidence Supporting the Trial Court's Materiality Findings*

S&B next challenges the sufficiency of the evidence supporting the trial court's materiality findings.  As we have already observed, S&B ignores the standards governing an appellant's challenge to the sufficiency of the evidence by offering an incomplete and one-sided presentation of the evidence.  (*Doe v. Roman Catholic Archbishop of Cashel & Emly, supra*, 177 Cal.App.4th at p. 218.)  Again, we would be justified in deeming the argument waived.  (*LA Investments, LLC v. Spix, supra*, 75 Cal.App.5th at p. 1061.)  Nevertheless, we will consider the merits.

The materiality of a contract breach is a question of fact.  (*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051-1052; *Schellinger Brothers v. Cotter* (2016) 2 Cal.App.5th 984, 1002 ["Whether a breach is material is usually left to the trier of fact 'to determine from all the facts and circumstances shown in evidence' "].)  "We review findings of fact for substantial evidence.  ' "In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]' [Citation.]  In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]' [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment." ' " (*Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1026.)

The trial court evaluated the materiality of Pulse's alleged breach using the six-factor test established by *Sackett v. Spindler* (1967) 248 Cal.App.2d 220 (*Sackett*).  That test instructs:  "In determining the materiality of a failure to fully perform a promise the following factors are to be considered:  (1)  The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated; (2) the extent

16

to which the injured party may be adequately compensated in damages for lack of complete performance; (3) the extent to which the party failing to perform has already partly performed or made preparations for performance; (4) the greater or less hardship on the party failing to perform in terminating the contract; (5) the willful, negligent, or innocent behavior of the party failing to perform; and (6) the greater or less uncertainty that the party failing to perform will perform the remainder of the contract." (*Id.* at p. 229.) Applying these factors, the trial court found, "even if Pulse's performance of the tasks Skowron asked it to perform constituted a failure to perform a contractual promise, any such breach constituted only a 'partial' breach of the parties' contract and did not justify termination." S&B challenges the trial court's evaluation of the *Sackett* factors.

Substantial evidence supports the trial court's finding that any breach by Pulse was immaterial. Beginning with the first *Sackett* factor, the trial court found the master services agreement required that Pulse maintain S&B's computer network, and Pulse appeared to have done so. The master services agreement and Thomas's testimony amply support the trial court's evaluation of the first factor. Though S&B argues in stream of consciousness fashion that Skowron considered data sharing between Citrus Heights and Sacramento "fundamental," and undertook the email migration himself to "avoid business impairment," these arguments amount to invitations to reweigh the evidence, which we cannot do. (*Gomez v. Smith, supra*, 54 Cal.App.5th at p. 1026.) We therefore conclude substantial evidence supports the trial court's finding that S&B would have obtained the substantial benefit reasonably anticipated. (*Sackett, supra*, 248 Cal.App.2d at p. 229.)

Turning to the second *Sackett* factor, the trial court found, "performance issues about which S&B complains, any deficiency constituting breach could be compensated by damages." S&B directs our attention to a limitation of liability provision in the master services agreement which provides, in pertinent part: "PULSE shall not be liable for any indirect, special or consequential damages arising out of this Agreement." S&B suggests

the limitation of liability provision compels a finding in its favor with respect to the second *Sackett* factor, "the extent to which the injured party may be adequately compensated in damages for lack of complete performance." (*Sackett, supra*, 248 Cal.App.2d at p. 229.) However, S&B does not explain how or why the limitation of liability provision necessarily affects the *Sackett* analysis, and we decline to develop the issue ourselves.

Continuing to the third *Sackett* factor, "the extent to which the party failing to perform has already partly performed or made preparations for performance," the trial court found "Pulse attended to the several items about which Skowron complains." S&B asserts the trial court's finding was "false." However, substantial evidence supports it. Although Skowron completed the email migration himself, the trial court reasonably determined the request for an "inventory" (which Pulse provided) was unclear, and Thomas credibly testified he orally conveyed an email migration plan to Skowron. Similarly, though installation of the VPN hardware was delayed, the evidence showed Pulse promptly ordered the hardware, and installed it the day after delivery. Moreover, as we have said, there was ample evidence that Pulse performed the essential elements of the master services agreement. Thus, substantial evidence supports the finding that Pulse partly performed or made preparations for performance.

With respect to the fourth *Sackett* factor, "the greater or less hardship on the party failing to perform in terminating the contract," (*Sackett, supra*, 248 Cal.App.2d at p. 229) the trial court found "the hardship falls more greatly on Pulse" The trial court explained the greater hardship to Pulse was best viewed through the lens of its business model, which frequently requires that Pulse incur significant up-front costs, as was the case here. S&B complains the trial court failed to consider the accounting firm's lost revenue and potential professional liability in failing to meet clients' needs. However, the trial court specifically said there was no evidence that Pulse's performance "impaired, or even threatened to impair, S&B's ability to serve its clients," and S&B does not point to

18

anything in the record that might suggest otherwise. Substantial evidence supports the trial court's finding as to the fourth *Sackett* factor.

Moving to the fifth *Sackett* factor, "the willful, negligent, or innocent behavior of the party failing to perform," the trial court found "there was nothing willful about Pulse's failure to meet Skowron's expectations." (*Sackett, supra*, 248 Cal.App.2d at p. 229.) Substantial evidence supports this finding as well. The email evidence showed Pulse responded promptly to Skowron's questions and requests. Although the VPN hardware was installed later than anticipated, the evidence showed the delay was caused by third parties (the shipping delay and difficulties with Comcast), not Pulse. This evidence was more than enough to support the trial court's finding that Pulse's failure to perform, if any, was neither willful nor negligent.

Finally, with respect to the sixth *Sackett* factor, "the greater or less uncertainty that the party failing to perform will perform the remainder of the contract," the trial court found "no basis on which to conclude that Pulse would [have been] slow to fulfill its responsibilities over the three-year term of the contract." (*Sackett, supra*, 248 Cal.App.2d at p. 229.) S&B argues without citation to the record that the evidence showed "consistent delay or non-performance based on Pulse's representation." It is possible S&B intends to refer to a December 4, 2018 email in which Thomas provided a list of tasks that Pulse was working on, along with projected completion dates. We will have more to say about this email in a moment. For now, we need only note that S&B fails to provide reasoned argument or record citations showing how or why the trial court's analysis of the final *Sackett* factor was unsupported by substantial evidence. As we have now said several times, it is not our job to construct theories or arguments to undermine the judgment. (See *Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 969 ["It is not our function to scour the record and make [appellant's] arguments for him"]; see also *Paglia & Associates Construction, Inc. v. Hamilton* (2023) 98 Cal.App.5th 318,

19

327 ["Appellants may not enlist the court as their legal assistant to develop arguments they merely suggest. The duty to present legal analysis belongs to the parties"].)

For all the foregoing reasons, we conclude substantial evidence supports the trial court's evaluation of the *Sackett* factors. We further conclude that substantial evidence supports the trial court's determination that any breach of the master services agreement by Pulse was immaterial.

## C. Cross-Claim for Breach of Warranty

S&B next challenges the trial court's rejection of its cross-claim for breach of warranty.[4] S&B's cross-complaint alleged Pulse breached a warranty in the master services agreement that "all services will be performed in a professional and workmanlike manner."[5] At trial, S&B argued Pulse breached the warranty by failing to meet completion dates set forth in the previously mentioned email dated December 4, 2018. The trial court rejected S&B's theory, finding Pulse was not unprofessionally slow in responding to any of S&B's requests, many of which were outside the scope of the master services agreement in any event. S&B appears to challenge the sufficiency of the evidence supporting the trial court's finding.

As previously discussed, we review findings of fact for substantial evidence. (*Gomez v. Smith, supra*, 54 Cal.App.5th at p. 1026.) As we have also explained, substantial evidence supports the trial court's findings that Pulse responded promptly to Skowron's questions and requests and was not the cause of any delay in installing the

---

[4] S&B does not challenge the trial court's rejection of its other cross-claims.

[5] The warranty provision provides, in its entirety: "PULSE warrants that all services will be performed in a professional and workmanlike manner. PULSE will perform under Client's direction in accordance with Client's general and reasonable standards and practices. PULSE provides a warranty of good workmanship with regards to all services provided under this Agreement. This warranty shall be the only warranty made by PULSE and is in lieu of all other warranties expressed or implied."

VPN hardware. Ignoring our deferential standard of review, S&B suggests the trial court should have found the alleged failure to meet the completion dates in the December 4, 2018 email constituted a breach of warranty. This argument fails for several reasons, two of which warrant brief elaboration.

The December 4, 2018 email speaks in terms of completion dates for "plans" rather than tasks (e.g., "Plan to migrate [Skowron] Email to [Office 365]" and "Plan to share data at Sacramento location and Citrus Heights"). During the trial, Thomas testified many of Skowron's requests—such as the email migration—were tasks that called for the development of project plans, rather than tasks that could be executed right away. He added that the completion dates on the December 4, 2018 email were dates by which the plan would be completed, rather than dates by which the task would be accomplished. Although Pulse does not appear to have delivered the email migration plan on time (the December 4, 2018 email said the plan would be sent later that day), there was no evidence that Pulse missed any of the other planning deadlines, and the trial court could have reasonably determined that the failure to send an email migration plan by the end of the day would not amount to a breach of warranty.

That brings us to the second problem with S&B's argument. S&B does not offer any legal argument or analysis why the alleged failure to meet the dates in the December 4, 2018 email necessarily amounted to a breach of warranty. After all, missed deadlines are an all-too-common occurrence. They do not inevitably lead to civil liability.

As we have explained, S&B has the burden to present argument and authority on each point made. (*Jones v. Superior Court, supra*, 26 Cal.App.4th at p. 99.) S&B does not explain how the allegedly missed deadlines in the December 4, 2018 email compel the conclusion that Pulse failed to perform professionally, especially in light of the evidence that these were planning deadlines for services outside the scope of the master services agreement. Again, we are not required to construct arguments for S&B or search the record for evidence to support them.

*D. The Datto Hardware*

S&B next argues the trial court erred in including the unamortized cost of the Datto hardware ($2,173) in the damage award. Though unclear, S&B appears to argue Pulse should not recover the unamortized cost of the Datto hardware because Thomas did not personally ask that the hardware be returned. But Thomas testified over S&B's hearsay objection that Pulse's "debt recovery company" (presumably, the previously mentioned collection firm) made several requests for the Datto hardware. S&B does not challenge the trial court's evidentiary ruling or explain why Thomas should have been required to personally demand the return of the Datto hardware to recover the unamortized costs as an element of damages. We reject the claim of error.

*E. Motions in Limine*

S&B next argues the trial court erred in denying two motions in limine. Both motions sought to exclude the previously described cost summary and invoices from three third-party vendors (together, the invoices). We review the trial court's evidentiary rulings for abuse of discretion. (*McMillin Companies, LLC v. American Safety Indemnity Co*. (2015) 233 Cal.App.4th 518, 529 ["Like many evidentiary rulings, orders on motions in limine are generally reviewed for abuse of discretion"].)[6] No abuse of discretion appears.

*1. Additional Background*

S&B's first motion in limine argued the cost summary and invoices had not been produced in discovery and should be excluded for misuse of the discovery process pursuant to Code of Civil Procedure section 2023.010. Pulse opposed the motion,

---

[6] The standard of review may be different when the motion in limine is used as a substitute for a dispositive motion. (*McMillin Companies, LLC v. American Safety Indemnity Co., supra,* 233 Cal.App.4th at pp. 529-530.) S&B does not suggest this was the case here.

arguing there had been no misuse of the discovery process, as none of the documents had been deliberately withheld. Pulse's opposition was supported by a declaration from Thomas averring that the cost summary and one of the invoices had been misplaced and only recently found, and the other invoices had been recently obtained from the vendors. All documents, Thomas averred, had been provided to S&B's counsel on November 14, 2022, approximately one month before trial.

S&B's second motion argued the cost summary and invoices should be excluded as hearsay and secondary evidence, and for lack of foundation. Pulse argued in opposition that the invoices were admissible under the hearsay exception set forth in *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 42-43 ["Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable"].

The trial court denied both motions in limine without prejudice. S&B renewed objections to the cost summary and invoices over the course of the trial. The trial court admitted the invoices over S&B's objections based on the hearsay and secondary evidence rules. The trial court also admitted most of the cost summary but excluded part of the document as irrelevant.

2.    *Analysis*

S&B argues the trial court should have granted its motions in limine and excluded both the cost summary and invoices, as well as any testimony regarding those documents. However, S&B does not specifically renew any of its objections based on Code of Civil Procedure section 2023.010, the hearsay or secondary evidence rules, or lack of

23

foundation. Instead, S&B suggests the cost summary and invoices should have been excluded because Pulse failed to produce credit card receipts showing the invoices had been paid. That argument does not correspond to any evidentiary or exclusionary rule set forth in the motions, and S&B does not point to any other authority suggesting an alleged failure to produce "proof of payment" constitutes misuse of the discovery process or requires exclusion of invoices or related documents under the hearsay or secondary evidence rules. We therefore conclude S&B has again failed to establish error.

## F.     *Attorney's Fees*

S&B advances two challenges to the attorney's fee award. First, S&B challenges the legal basis for the award, arguing the trial court erred in concluding the master services agreement provides for attorney's fees. Second, S&B challenges the amount of the award. We address these challenges in turn.[7]

### 1.     *Legal Basis for Attorney's Fees*

We review the issue whether a party is legally entitled to attorney's fees and costs de novo. (*Garcia v. Santana* (2009) 174 Cal.App.4th 464, 468 ["The issue of a party's entitlement to attorney's fees is a legal issue which we review de novo"]; accord *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*) [" 'a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo' "].)

Code of Civil Procedure section 1021 codifies the "American rule" that each party to litigation ordinarily pays its own attorney fees. (*Mountain Air, supra*, 3 Cal.5th at p. 751.) But the statute also allows parties to contract around the rule. (*Ibid.*) Thus, parties may agree to award attorney's fees to the prevailing party in any litigation between them, whether the litigation sounds in contract or tort. (*Id.* at p. 752.)

---

[7] S&B does not appear to challenge the trial court's identification of Pulse as the prevailing party.

If the litigation sounds in contract, the attorney's fee arrangement must comply with Civil Code section 1717, which provides, in part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).) We must decide whether the master services agreement "specifically provides" for attorney's fees. (*Ibid.*)

"A contract may impliedly as well as expressly permit recovery of attorney fees in the event of suit to enforce the contract." (*Jen-Mar Constr. Co. v. Brown* (1967) 247 Cal.App.2d 564, 573.) We apply ordinary rules of contract interpretation to determine whether the parties impliedly entered an agreement for the payment of attorney's fees. (*Mountain Air, supra*, 3 Cal.5th at p. 752.) "Accordingly, we first consider the mutual intention of the parties at the time the contract providing for attorney fees was formed. [Citation.] Our initial inquiry is confined to the writing alone. [Citations.] ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" ' [Citations.] At the same time, we also recognize the 'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.' " (*Ibid.*)

We start, then, with the language of the master services agreement. Pulse relies on section 10, which provides in part: "Client will be responsible for all third party costs

25

incurred by PULSE to collect overdue invoices."[8]  Pulse emphasizes the presence of the modifier "all," and argues the ordinary and popular meaning of "third party costs," as used in the context of debt collection, would naturally encompass costs incurred in litigation, including attorney's fees.  Pulse finds support for this interpretation in *Mastronardi International Limited v. SunSelect Produce (California), Inc.* (E.D. Cal. Aug. 23, 2019, No. 1:18-cv-00737-AWI-JLT) 2019 U.S. Dist. LEXIS 143934 (*Mastronardi*) and *Oklahoma Fixture Co. v. ASK Computer Systems, Inc.* (10th Cir. 1995) 45 F.3d 380 (*ASK*).  Those cases, though nonbinding, are instructive.[9]

  *Mastronardi* arose out of a contract dispute between a tomato merchant (Mastronardi) and a tomato grower (SunSelect).  (*Mastronardi, supra*, 2019 U.S. Dist. LEXIS 143934, *1.)  Mastronardi sued SunSelect for breaching an exclusive agreement for the sale of piccolo tomatoes, and SunSelect countersued for breach of contract and various statutory claims.  (*Id.* at *1-2.)  As relevant here, SunSelect also sought an award of attorney's fees under the agreement, which provided:  " 'Mastronardi hereby further agrees to fully indemnify Grower [SunSelect], and to fully provide for all costs incurred by the Grower [SunSelect] in enforcing this indemnity.' "  (*Id.* at *32.)

---

[8]  Section 10, entitled "PAYMENT TERMS," provides in full:  "Disputed [i]nvoices must be reported within 15 days of the invoice date.  Outstanding invoices older than 30 days shall accrue interest at 18% annualized.  Stoppage in service to the Client may occur for invoices over 30 days old.  Any account delinquent over 55 days will be placed into collections for resolution.  Client will be responsible for all third party costs incurred to collect overdue invoices."

[9]  S&B directs our attention to *Royster Construction Co. v. Urban West Communities* (1995) 40 Cal.App.4th 1158, in which the defendant, a contractor, sought attorney's fees pursuant to a mechanic's lien release bond that provided for payment of the mechanic's lien together with " 'costs of suit.' "  (*Id.* at p. 1170.)  The Court of Appeal rejected the request, stating:  "A contract which provides for the payment of 'costs' alone does not usually include attorney's fees."  (*Ibid.*)  Here, as we shall discuss, the master services agreement does not provide for "payment of 'costs' alone."  It is considerably broader, and the context of the agreement indicates it was intended to cover more.

Mastronardi moved to dismiss SunSelect's counterclaims. (*Mastronardi, supra*, 2019 U.S. Dist. LEXIS 143934, *1.) The motion was granted in part and denied in part. (*Id.* at *41.) The district court rejected Mastronardi's motion to strike the request for contractual attorney's fees, finding the term "costs" included attorney's fees. (*Id.* at *37.) The district court observed that the agreement specifically referred to " 'costs incurred . . . in enforcing [an] indemnity' " and " 'the cost of any defense.' " (*Id.* at *32, 36.) The district court explained: "When read in that context, the agreement's use of the term 'costs'—enforcement costs and defense costs—is best interpreted as meaning 'litigation costs,' which may include attorney's fees. This is because in the world of indemnity enforcement and defense, such as for contractual or product liability claims, attorney's fees are usually part and parcel of the associated costs, especially when the quarreling parties are commercial entities, which is the case here." (*Id.* at *38.)

The district court found support for its interpretation of the agreement in Code of Civil Procedure sections 1032 and 1033.5, which provide for recovery of "costs" by the prevailing party, and include attorney's fees in certain circumstances, "such a where the parties' contract provides for litigation costs and attorney's fees." (*Mastronardi, supra*, 2019 U.S. Dist. LEXIS 143934, *39.) The district court found further support for its interpretation in *ASK*, the other case on which Pulse relies.

In *ASK*, the plaintiff (Oklahoma Fixture) sued the defendant (ASK) in a diversity action in Oklahoma, seeking damages for breach of a contract for the sale of computer software and breach of warranty. (*ASK, supra,* 45 F.3d at p. 380.) The contract, which contained a California choice of law provision, provided, in part: " 'Should it be necessary for ASK to initiate legal proceedings to collect monies due from Buyer, ASK is entitled to recover all reasonable collection costs.' " (*Ibid.*) ASK prevailed in the district court and received an award of attorney's fees. (*Id.* at p. 381.) Oklahoma Fixture appealed. (*Id.* at p. 380.)

On appeal, Oklahoma Fixture argued the contract only authorized "collection costs," not attorney's fees. (*ASK, supra,* 45 F.3d at pp. 381-382.) The Tenth Circuit Court of Appeals disagreed. (*Id.* at pp. 382-383.) Applying California principles of statutory and contract interpretation, the federal appellate court concluded "a common sense reading" of " 'all reasonable collection costs' " included attorney's fees. (*Id.* at p. 382.) This was especially so, the court elaborated, given that "the situation that gives rise to the right to recover 'reasonable collection costs' is where it is 'necessary for ASK to initiate *legal proceedings.*' " (*Ibid*.) "Taken together with the reasonable collection costs language," the court concluded, "the 'legal proceedings' language can only mean that attorney's fees are to be included under this provision." (*Ibid.*)

S&B attempts to distinguish *Mastronardi* and *ASK* on the facts, arguing the contracts in those cases more clearly contemplated recovery of litigation costs, including attorney's fees.[10] (See, *e.g., Mastronardi, supra*, 2019 U.S. Dist. LEXIS 143934, *38 [providing for recovery of " 'all costs incurred by' " one party " 'in enforcing' " the other party's indemnity obligations or " 'the cost of any defense' "]; *ASK, supra*, 45 F.3d at p. 381 [providing for " 'all reasonable collection costs' " in the event " 'legal proceedings' " become necessary].) The point is well taken, but ultimately unavailing. True, section 10 does not specifically refer to legal proceedings, litigation costs, or attorney's fees. But collection efforts—particularly those outsourced to third parties —will frequently devolve into litigation. (See, e.g., *Heintz v. Jenkins* (1995) 514 U.S. 291, 297 [holding that the Fair Debt Collection Practices Act applies to lawyers, and observing that "litigating, at first blush, seems simply one way of collecting a debt"]; see also Black's Law Dictionary (12th ed. 2024) [defining "cost," in part, as "[a]n expense incurred to achieve some end" and "costs of collection" as "[e]xpenses incurred in receiving payment

---

[10] S&B also argues the Tenth Circuit Court of Appeals decided *ASK* as a matter of Oklahoma law. That is simply not so. (*ASK, supra*, 45 F.3d at p. 383.)

of a note; esp., attorney's fees incurred in the effort to collect a note"].)  It requires no exercise of imagination to see that "third party costs," in the collection context, will often involve litigation costs, including attorney's fees.  Indeed, the complaint here appears to have been filed by the previously mentioned collection firm.  Considering the context of the master services agreement and giving a common sense reading to section 10, we agree with the trial court that, "when lay-people use the words 'all third party costs incurred to collect [amounts due],' they mean *all* third party costs, *including* attorney's fees—not all third party costs *except* attorney's fees."

S&B resists this interpretation, arguing it fails to consider the master services agreement as a whole.  Specifically, S&B argues an expansive interpretation of section 10 would conflict with section 6 of the master services agreement, which limits Pulse's liability for damage to S&B's systems or equipment, and provides, in pertinent part: "Each party will indemnify and hold the other party harmless from all damages, expenses (including attorney's fees) and other costs or liabilities resulting from such liability."  We perceive no conflict.  The words "expenses" and "costs" are ordinarily synonymous in everyday usage.  (See Roget's Thesaurus (6th ed. 2001) p. 880 [listing "expenses" as a synonym of "cost"]; see also *Taniguchi v. Kan Pacific Saipan Ltd.* (2012) 566 U.S. 560, 573 [recognizing that " ' "costs" has an everyday meaning synonymous with "expenses" ' " but holding that taxable costs under 28 U.S.C. § 1920 are more limited].)  And they are most reasonably understood as synonyms in the master services agreement, where section 6 suggests an equivalence between "expenses" and "other costs."

Given that section 6 of the master services agreement includes attorney's fees in the category of "expenses," and uses the words "expenses" and "costs" interchangeably, consistent with everyday usage, we conclude attorney's fees must also be included in the category of "costs" discussed in section 10.  Reading the master services agreement as a whole, and exercising our independent judgment, we conclude the agreement authorizes the attorney's fee award.  We next consider S&B's challenge to the amount of the award.

## 2. *Amount of Award*

Finally, S&B argues the trial court erred in setting the amount of the award. "We review attorney fee awards for abuse of discretion. An experienced trial judge is in the best position to evaluate the value of professional services rendered in the trial court. We presume the fee approved by the trial court is reasonable. We will not disturb the trial court's judgment unless it is clearly wrong." (*Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 743.) Again, no abuse of discretion appears.

### a. *Additional Background*

The trial court evaluated the reasonableness of Pulse's request for attorney's fees using both the "percentage-of-recovery" and lodestar approaches. (See *Karton v. Ari Design & Construction, Inc., supra*, 61 Cal.App.5th at pp. 744-745.) "The percentage method calculates the fee as a percentage share of a recovered common fund or the monetary value of plaintiffs' recovery. The lodestar method, or more accurately the lodestar-multiplier method, calculates the fee 'by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.' " (*Laffitte v. Robert Half International, Inc.* (2016) 1 Cal.5th 480, 489.) "The two approaches to determining a fee contrast in their primary foci: 'The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved." (*Ibid.*)

The trial court began with the percentage of recovery analysis, noting the amount of fees sought by Pulse ($124,160) seemed out of proportion to the amount awarded as damages ($54,080). The trial court then explained that several considerations worked in favor of Pulse's request, while others worked against it. On the one hand, the trial court observed, the issues were straightforward and the amount in controversy relatively

modest. Furthermore, the trial court noted, Pulse advanced a number of unsuccessful arguments, including an ill-fated request for prejudgment interest. On the other hand, Pulse had to respond to S&B's cross-complaint and discovery demands, all of which complicated the case. The trial court also observed that the cross-complaint sought damages " 'in a sum of at least $50,000,' " an amount based on S&B's mandatory settlement conference statement.

The trial court then turned to the lodestar analysis. Pulse claimed 328.2 hours in attorney time, valued at $131,280. The trial court found these totals excessive, given the simplicity of the issues and result achieved. Accordingly, the trial court approved only 185 hours of attorney time at $350 per hour, for a total of $64,750.

The trial court then set about quantifying Pulse's success rate. The trial court observed that Pulse prevailed on its contract claim to the tune of $54,080, approximately 32 percent of the $165,809 claimed as damages. The trial court also observed that "Pulse prevailed in defending against S&B's multi-count counterclaim for 'at least' $50,000." "As to that half of the case," the trial court continued, "Pulse achieved a total win." Extrapolating from these numbers, the trial court concluded, "in total, Pulse prevailed as to approximately 66% of the case. That is, it achieved 32% of what it sought in its half of the case, and it achieved 100% of its objective in its defense of S&B's half of the case. (That is: (1/2 x 32%) + (1/2 x 100%) = 66%)." "And," the trial court concluded, "if one applies Pulse's 66% success rate to Pulse's fee claim for $124,160, one gets a figure of approximately $82,000, i.e., a figure in general proximity with the lodestar figure the Court determined using the method described in subsection 'D' above (i.e., $64,750)." Accordingly, the trial court entered an award of $64,750 in fees.

### b. Analysis

S&B argues the trial court abused its discretion in setting the fee amount in four ways. First, S&B suggests the trial court failed to consider Pulse's discovery failures. Had Pulse produced credit card receipts, S&B seems to say, the trial court would not have

31

had to spend as much time substantiating damages, and attorney's fees would have been less. The problem for S&B, however, is the trial court quite clearly considered this issue, noting: "Pulse offered limited documentation to corroborate its damage claims, and the evidence regarding Pulse's mitigation efforts was equally spartan." Nothing suggests the trial court abused its discretion in balancing Pulse's litigation conduct against the results achieved.

Second, S&B argues the trial court assigned undue importance to the cross-complaint, given that the cross-claim for breach of warranty overlapped with the claim for breach of contract. This argument also fails. Although the issues may have overlapped, the trial court was in the best position to determine whether the cross-complaint extended the trial or contributed to attorney's fees, and if so, by how much. S&B has given us no reason to second guess the trial court's assessment of the cross-complaint's effect on fees.

Third, S&B argues the trial court was wrong to suppose that Pulse's potential exposure on the cross-complaint was " 'at least $50,000.' " Although far from clear, S&B seems to suggest the trial court should not have relied on its mandatory settlement conference statement for the $50,000 figure, as that was merely offered as part of settlement negotiations, and those negotiations went nowhere. S&B does not support this argument with relevant authority or analysis, let alone adequate citations to the record. We again decline to develop S&B's arguments for it.

Finally, S&B's argues the trial court erred in quantifying Pulse's success rate. This argument is almost entirely unintelligible and suffers from all of the previously mentioned briefing defects. As best we can tell, S&B thinks the trial court should have compared an earlier damage estimate on the complaint by Pulse ($255,834) against a later damage estimate on the cross-complaint by S&B ($11,964). Had the trial court compared these numbers, S&B says, the court would have found Pulse achieved a success rate of only 25 percent, rather than 66 percent. Again, S&B has not given us any reason to

question the trial court's identification or evaluation of the relevant amounts. And even assuming they were in error, the error would be harmless, as the award appears to have been based on the lodestar approach, which S&B does not challenge.

## III.  DISPOSITION

The judgment and order awarding attorney's fees and costs are affirmed. Respondent Pulse Technology Consulting Group, Inc. shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

_____

RENNER, J.

We concur:

/S/

_____

EARL, P. J.

/S/

_____

KRAUSE, J.